ACCEPTED
12-15-00177-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/22/2015 4:50:16 PM
Pam Estes
CLERK

## CAUSE NO. 12-15-00177-CV

IN THE COURT OF APPEALS

FOR THE

TWELFTH COURT OF APPEALS DISTRICT

AT TYLER, TEXAS.

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS

9/22/2015 4:50:16 PM

PAM ESTES
Clerk

**WALTER BOUNDS and wife, CAROLYN B. BOUNDS, Appellant,**

**VS.**

**JOHN THOMAS PRUD'HOMME, JOSEPH GILBERT PRUD'HOMME, JOSEPH LYNN PRUD'HOMME, PETER A. BREEN, Individually and as Successor Trustee of the BREEN FAMILY TRUST, JANET M. SUTRO, SUSAN E. BREEN, and TERRANCE E. BREEN, individually and d/b/a E. G. AND M. A. PRUD'HOMME BENEFICIARIES PARTNERSHIP, Appellee.**

*On Appeal from the 1st Judicial District Court
of San Augustine County, Texas.*

## BRIEF OF APPELLANT

**Thomas R. McLeroy, Jr.**
**Bar No. 13766800**
**P. O. Box 668**
**Center, Texas 75935**
**(936) 598-2701**
**FAX (936) 598-6086**
**mcleroylaw@sbcglobal.net**

**ATTORNEY FOR APPELLANT**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to **TEX. R. APP. P., 38.1(a)**, the following persons are parties to the trial court's judgment or other order appealed from and the names and addresses of all trial and appellate counsel, to-wit:

PARTIES:

| | |
|---|---|
| Appellant: | **WALTER BOUNDS**<br>**CAROLYN B. BOUNDS** |
| | |
| Appellee: | **JOHN THOMAS PRUD'HOMME**<br>**JOSEPH GILBERT PRUD'HOMME**<br>**JOSEPH LYNN PRUD'HOMME**<br>**PETER A. BREEN,**<br>**The BREEN FAMILY TRUST**<br>**JANET M. SUTRO**<br>**SUSAN E. BREEN**<br>**TERRANCE E. BREEN**<br>**The E.G. AND M.A. PRUD'HOMME BENEFICIARIES PARTNERSHIP** |

**COUNSEL OF RECORD:**

**Attorney for Appellant:**

**Thomas R. McLeroy, Jr.**
**Bar No. 13766800**
**P. O. Box 668**
**Center, Texas 75935**
**(936) 598-2701**
**FAX (936) 598-6086**
**mcleroylaw@sbcglobal.net**

**Attorney for Appellee:**

**Robert G. Hargrove**
**Bar No. 24032391**
**Osborn, Griffith & Hargrove**
**515 Congress Avenue, Suite 2450**
**Austin, Texas 78701**
**(512) 476-3529**
**FAX (512) 476-8310**
**rob@texasenergylaw.com**

# TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **i**
 **PARTIES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **i**
 **COUNSEL OF RECORD.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **ii**

**TABLE OF CONTENTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iii**

**INDEX OF AUTHORITIES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **v**

**STATEMENT OF THE CASE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 1**

**ISSUES PRESENTED.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 3**
 **ISSUE NO. 1.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 3**
 **ISSUE NO. 2.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 3**
 **ISSUE NO. 3.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 3**

**STATEMENT OF FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 3**

**ISSUE NO. 1**
 **(Restated).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 9**

**SUMMARY OF THE ARGUMENT**
 **(Under Issue No. 1).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 9**

**ARGUMENT AND AUTHORITIES**
 **(Under Issue No. 1).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 10**

**ISSUE NO. 2**
 **(Restated).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 20**

**SUMMARY OF THE ARGUMENT**
 **(Under Issue No. 2).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 21**

**ARGUMENT AND AUTHORITIES**
 **(Under Issue No. 2).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 22**

**ISSUE NO. 3**
 **(Restated).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 31**

**SUMMARY OF THE ARGUMENT**
 **(Under Issue No. 3).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 31**

**ARGUMENT AND AUTHORITIES**
      (Under Issue No. 3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 32**

**CONCLUSION AND PRAYER.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 40**

**CERTIFICATE OF COMPLIANCE.** . . . . . . . . . . . . . . . . . . . . . . . . . . **page 42**

**CERTIFICATE OF SERVICE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 43**

**TAB 1**
      (Trial Court's Judgment). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-I-**

**TAB 2**
      (Trial Court's Findings of Fact and Conclusions of Law). . . . . . . . . **-IX-**

**TAB 3**
      (Farm and Ranch Contract).. . . . . . . . . . . . . . . . . . . . . . . . . . **-XXIV-**

**TAB 4**
      (Prud'homme Partnership Deed). . . . . . . . . . . . . . . . . . . . . . . . . . **-XL-**

**TAB 5**
      (Breen Deeds). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-XLVI-**

**TAB 6**
      (Title Insurance Commitment No. SA01-135 Schedules). . . . . . . . **-LXII-**

**TAB 7**
      (Bounds' Title Insurance Policy). . . . . . . . . . . . . . . . . . . . . . . . **-LXXIII-**

# INDEX OF AUTHORITIES

**RULES:**

Tᴇx. R. Aᴘᴘ. P., 38.1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **i**

Tᴇx. R. Aᴘᴘ. P., 9.4(i)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 42**

Tᴇx. R. Aᴘᴘ. P., 9.5.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 43**


**STATUTES:**

Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ, §26.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 30**

Tᴇx. Cɪᴠ. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ, §16.051. . . . . . . . . . . . . . . . . . . . . . **page 33**

Tᴇx. Cɪᴠ. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ, §§37.001, *et seq*.. . . . . . . . . . . . . . . . **page 2**

Tᴇx. Pʀᴏᴘ. Cᴏᴅᴇ, § 5.01(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 15**


**CASES:**

*Alford v. Crum*, 671 S.W.2d 870 (Tex. 1984). . . . . . . . . . . . . . . . . . **page 14**

*Anderson v. City of Seven Points*, 806 S.W.2d 791 (Tex. 1991). . . . . . . . **page 22**

*B.M.C. Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789
(Tex. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 23**, **page 24**

*Bagby v. Bredthauer*, 627 S.W.2d 190 (Tex. App. –Austin,
1981, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 12**

*Bass v. Harper*, 441 S.W.2d 825 (Tex. 1969). . . . . . . . . . . . . . . . . . **page 12**

*Brown v. Havard*, 593 S.W.2d 939 (Tex. 1980). . . . . . . . . . . . . . . . . **page 33**

*Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377 (Tex. 1987). . . . . **page 24**

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). . . . . . . . . . . . . **page 23**

*City of Stamford v. King*, 144 S.W.2d 923 (Tex. Civ. App. –Eastland, 1940, writ ref'd.).................................... page 14

*Coker v. Coker*, 650 S. W. 2d 391 (Tex. 1983)...................... page 10

*Davis v. Grammar*, 750 S.W.2d 766 (Tex. 1988)............. page 30, page 31

*Dewitt County Electric Coop. v. Parks*, 1 S.W.3d 96 (Tex. 1998)................................... page 10, page 11, page 17

*Farm & Ranch Investors, Ltd., v. Titan Operating, L.L.C.*, 369 S.W. 3d 679 (Tex. App. –Ft. Worth, 2012, pet. denied)......... page 14

*Garrett v. Dills*, 157 Tex. 92, 299 S.W.2d 904 (1957). ............... page 14

*Hardy v. Bennefield*, 368 S.W.3d 643 (Tex. App. –Tyler, 2012, no pet.). .................................... page 24, page 25

*Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462 (Tex. 2011)................. page 16, page 17

*Johnson v. Conner*, 260 S.W.3d 575 (Tex. App. –Tyler, 2008, no pet.). ................................... page 14, page 15

*Lott v. Lott*, 370 S.W.2d 463 (Tex. 1963). ......................... page 14

*Luckel v. White*, 819 S.W.2d 459 (Tex. 1991). ....... page 10, page 11, page 14

*Ortiz v. Jones*, 917 S.W.2d 770 (Tex. 1996)....................... page 23

*Pich v. Langford*, 157 Tex. 335, 302 S.W.2d 645 (1957)....... page 11, page 12

*Sharp v. Fowler*, 151 Tex. 490, 252 S.W.2d 153 (1952). ............. page 15

*Simpson v. Curtis*, 351 S.W.3d 374 (Tex. App. –Tyler, 2010, no pet.).................................. page 24, page 25, page 30

*Smith v. Allison*, 157 Tex. 220, 301 S.W.2d 608 (1956). ............. page 11

*Sullivan v. Barnett*, 471 S.W.2d 39 (Tex. 1971)..................... page 33

*Tex. Dep't of Pub. Safety v. Stockton*, 53 S.W.3d 421 (Tex. App. —San Antonio 2001, pet. denied)..................... page 24

vi

*Walker v. Foss*, 930 S.W.2d 701 (Tex. App. –San Antonio, 1998, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 15**

*Waters v. Ellis*, 158 Tex. 342, 312 S.W.2d 231 (1958). . . . . . . . . . . . . . . . . **page 14**

*Williams v. Glash*, 789 S.W.2d 261 (Tex. 1990). . . . . . . . . . . . . . . . . . . . . **page 25**

## OTHER AUTHORITIES:

*Blacks Law Dictionary* (10th ed. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . **page 12**

IN THE COURT OF APPEALS

FOR THE

TWELFTH COURT OF APPEALS DISTRICT

AT TYLER, TEXAS.

WALTER BOUNDS and wife, CAROLYN B. BOUNDS, Appellant,

VS.

JOHN THOMAS PRUD'HOMME, JOSEPH GILBERT PRUD'HOMME, JOSEPH LYNN PRUD'HOMME, PETER A. BREEN, Individually and as Successor Trustee of the BREEN FAMILY TRUST, JANET M. SUTRO, SUSAN E. BREEN, and TERRANCE E. BREEN, individually and d/b/a E. G. AND M. A. PRUD'HOMME BENEFICIARIES PARTNERSHIP, Appellee.

BRIEF OF APPELLANT

TO THE HONORABLE COURT OF APPEALS:

Now come WALTER BOUNDS and CAROLYN B. BOUNDS, the Appellants in the above styled and numbered matter, and respectfully submit the following brief of their arguments and authorities:

**STATEMENT OF THE CASE**

The Appellants, hereinafter referred to as the "Bounds," filed this suit to recover a mineral interest that the Appellees, hereinafter referred to as the Prud'hommes," agreed to convey to the Bounds but later claimed they reserved. The conveyance was accomplished by six almost identical deeds from the Prud'hommes to the Bounds. (Appendix, **Tab 4**, **Tab 5**). The Bounds sought

relief in the trial court under the statute and rules governing Trespass to Try Title suits, for a construction of their instruments of conveyance under the Uniform Declaratory Judgment Act, TEX. CIV. PRAC. & REM. CODE, §§ 37.001, *et seq.*, for reformation, if necessary, of their instruments of conveyance due to fraud, accident, mistake or scriveners's error and for cancellation of certain mineral leases executed by the Prud'hommes as a cloud upon the Bounds' title to the minerals. The Prud'hommes answered with their plea of "not guilty," a general denial and a plea of limitations. After a bench trial, District Judge Craig M. Mixon entered a judgment denying the Bounds recovery of an undivided 45% interest in the mineral estate from the Prud'hommes and awarding the title to and possession of those minerals to the Prud'hommes. The judgment awarded Bounds title to and possession of an undivided 5% interest in the mineral estate claimed by Appellants, Peter A. Breen, individually and as Successor Trustee of the Breen Family Trust, Janet M. Sutro, Susan E. Breen, and Terrance E. Breen. (Appendix, Tab 1). The Bounds appeal from the judgment denying them relief with respect to the 45% interest awarded to the Prud'hommes.

## ISSUES PRESENTED

### ISSUE NO. 1
**(I CR, pg. 91, "Findings of Fact and Conclusions of Law,"
Conclusion of Law Nos. 1 - 2)**

**WHETHER THE TRIAL COURT INCORRECTLY CONSTRUED THE DEEDS FROM THE PRUD'HOMME PARTNERSHIP TO THE BOUNDS TO UNAMBIGUOUSLY RESERVE THE GRANTORS' MINERALS.**

### ISSUE NO. 2
**(I CR, pp. 86, 90, 92, "Findings of Fact and Conclusions of Law,"
Findings of Fact Nos. 19, 43 - 45, Conclusion of Law No. 6)**

**WHETHER THE TRIAL COURT INCORRECTLY RULED THAT THE DEEDS FROM THE PRUD'HOMMES TO THE BOUNDS WERE NOT SUBJECT TO REFORMATION DUE TO FRAUD, ACCIDENT, MISTAKE OR SCRIVENER'S ERROR.**

### ISSUE NO. 3
**(I CR, pp. 90 - 92, "Findings of Fact and Conclusions of Law,"
Findings of Fact Nos. 46 - 48, Conclusions of Law Nos. 3 - 5)**

**WHETHER THE TRIAL COURT INCORRECTLY RULED THAT THE STATUTE OF LIMITATIONS BARRED THE BOUNDS FROM SEEKING RELIEF BY WAY OF REFORMATION.**

## STATEMENT OF FACTS

In 2001, Walter Bounds and his wife, Carolyn Bounds, decided to purchase a tract of rural property in order to fulfill Mrs. Bounds' dream of land ownership. (I RR, pg. 32, lines 1 - 15; pg. 71, line 20 - pg. 72, line 8). Because they were inexperienced in the process of acquiring and managing land, they

enlisted the assistance of their son-in-law, Terry Scull, who was experienced in the matters of real estate acquisitions and management. (I RR, pg. 32, line 6 - 18; pg. 70, lines 7 - 21). Through his contacts and connections, Mr. Scull was aware that the Prud'hommes desired to sell the 126.632 acre tract involved in this suit. (I RR, pg. 33, line 16 - pg. 34, line 3; pg. 71, lines 5 - 19). The parties referred to the tract as the pine "plantation." (I RR, pg. 32, line 21 - pg. 33, line 9; pg. 122, lines 15 - 25). From the beginning, the Prud'hommes' offer included the sale their mineral interest. (I RR, 38, line 3 - pg. 40, line 4; pg. 73, lines 9 - 21; pg. 121, lines 8 - 24; pg. 122, lines 15 - pg. 123, line 20; II RR, Plaintiff's Exhibit 28; Exhibit P-27, pg. 65, line 25 - pg. 66, line 12). The Bounds, along with Mr. Scull, inspected the property, discussed its merits and advantages, including benefits of owning the minerals, and, in due course, determined that it would be a suitable acquisition. (I RR, pg. 33, lines 10 - 13; pg. 38, line 3 - pg. 40, line 4; pg. 71, lines 5 - pg. 72, line 8; pg. 74, line 9 - pg. 74, line 2). The Bounds relied upon their son-in-law to negotiate the terms of the sales contract and arrange for the closing. (I RR, pg. 34. lines 11 - 23; pg. 72, line 72 - pg. 73, line 3; pg. 74, line 24 - pg. 75, line 2). Neither the Bounds nor Mr. Scull had any direct dealings with the Prud'hommes during the negotiations or the closing of the sale. (I RR, pg. 34. line 24 - pg. 35, line 7; pg. 74, lines 3 - 7). Both Mr. Scull and the Prud'hommes communicated with each other through Mr. John Gorham, a consulting forester, and John Crawford, a realtor and the Prud'hommes' consulting forester. (I RR., pg 71, lines 9 - 16; pg. 73, lines 9 -16;

pg. 74, lines 3 -10; pg. 122, lines 15 - 25; pg. 123, line 21 - pg. 124, line 8).

As a result of the negotiations, a written sales contract between the Bounds and the E. G. and M. A. Prud'homme Beneficiaries Partnership was executed. (I RR, pg. 35, line 20 - pg. 36, line 18; pg. 74, lines 11 - 23; pg. 76, line 16 - pg. 78, line 6; pg. 112, line 25 - pg. 113, line 23; pg. 121, lines 8 - 17; pg. 125, lines 2 - 4; II RR, Plaintiffs' Exhibit 21). In compliance with the Prud'hommes' offer, the contract provided that "All minerals owned [by the Seller are] to be conveyed" and did not provide for the retention of any interest by the Seller. (II RR, Plaintiffs' Exhibit 21, Paragraph 2(A), 2(A)(2)). The contract, also, provided that closing of the sale would occur on or before September 2, 2001, or within 7 days after objections to matters disclosed in the title insurance commitment have been cured, whichever date is later. (II RR, Plaintiffs' Exhibit 21, Paragraph 9). Upon failure to close, specific remedies were available to the non-defaulting party. (II RR, Plaintiffs' Exhibit 21, Paragraph 9). In the case of the Seller's failure to close for any reason other than Seller's failure to make timely casualty repairs or deliver the title insurance commitment, the Buyer's remedy included enforcement of specific performance, seeking any other relief provided by law, or both. (II RR, Plaintiffs' Exhibit 21, Paragraph 15).

The sale closing did not occur on September 2, 2001. (I RR, pg. 114, lines 6 - 10). When the title insurance commitment was issued, it showed title to the property to be vested in certain individual members as well as the E.G. and M. A. Prud'homme Beneficiaries Partnership, and required execution of the

proposed deed to the Bounds by the individual members of the partnership, including Eleanor Prud'homme Breen. (II RR, Exhibit D-23). Eleanor Prud'homme Breen had died testate two years earlier, survived by her husband, Hal Joseph Breen, and four children, Appellees Terrance J. Breen, Susan E. Breen, Peter A. Breen and Janet M. Breen Suttro. (II RR, Plaintiffs' Exhibit 4). Her will left her estate to a family trust of which her husband was the trustee. (II RR., Plaintiffs' Exhibit 4). The requirement that they execute the deeds delayed the closing. (I RR, pg. 114, lines 6 - 25; pg. 116, line 19 - pg. 118, line 3; pg. 147, line 7 - pg. 148, line 10; II RR, Exhibit P-27, pg 67, lines 6 - 17). The Breens initially objected to signing the deeds, but eventually agreed to do so and permit the partnership to receive the funds. (I RR., pg. 143, line 15 - pg. 145, line 11; pg. 150, lines 5 - 14). The closing was, therefore, delayed by the Prud'hommes' inability or unwillingness to execute the conveyances required by the title insurance company as a prerequisite to insuring the Bounds' title. By the time the title insurance company's requirements were addressed, closing had been delayed until after the Breens last deed was executed on October 17, 2001. (II RR, Plaintiffs' Exhibits 7 - 9).

John Griffin, the Bounds' lawyer, prepared the deeds that the Prud'hommes' signed. (II RR, Exhibit P-27, pg. 43, line 16 - pg. 44, line 14; pg. 53, line 17 - pg. 54, line 1; pg. 55, lines 2 - 9). Each of the deeds contained a paragraph bearing the heading, "Reservations from and Exceptions to Conveyance and Warranty:" (II RR, Plaintiffs' Exhibit 5; Plaintiffs' Exhibits

**6 - 9**).   Beneath each of the headings, the deeds contained the following statement:

> "TITLE to any of the oil, gas and other minerals, in, under and that may be produced from the above-described real property, together with all rights, privileges and immunities relating thereto, including the following:
>       "1.     MINERAL RESERVATION as set forth in instrument from Roy Atkinson to V. R. Marlow, dated November 7, 1934, and recorded in Vol.74, Page 542, Deed Records of San Augustine County, Texas, reserving one-half (½) of the minerals and/or royalty interests, the royalties, bonuses and rentals in connection therewith.
>       "2.     MINERAL RESERVATION as set forth in the instrument from E. G. Prud'homme, et ux, to Eck G. Prud'homme, et al, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, reserving one-half (½) of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith."  (II RR, Plaintiffs' Exhibits 5 - 9).

The first two clauses of the paragraph quoted above are essentially identical to the corresponding provisions of Schedule B "Exceptions from Coverage" item **9(f)** of the title insurance commitment and Schedule B "Exceptions from Coverage" item **6(f)** of the Owner Policy of Title Insurance issued in connection with the Bounds' purchase.  (II RR, Exhibits D-23, D-24). Other than the names of the grantors, each of the deeds was identical to the others except that the Breen deeds contained an additional sentence preceding the above quoted paragraphs that read, "This Deed is intended to convey all of the Grantor's interest in and to the above-described real property."  (II RR., Plaintiff's Exhibits 6 - 9).  Mr. Griffin intended the text following the heading in question to be exceptions to the grantors' warranties, and not reservations of their mineral interest or exceptions from the conveyance, and was of the opinion

that the text was effective to do so. (II RR., Exhibit P-27, pg. 6, [pg. 21, lines 8 - 20]; pg. 7, [pg. 25, lines 6 - 23]; pp. 12 - 13, [pg. 47, lines 12 - 18; pp. 48, line 13 - pg. 49, line 13; pp. 49, line 20 - pg. 50, line 16]; pg. 18, [pg. 71, line 21 - pg 72, line 13]; pg. 19, [pg. 73, line 6 - pg. 74, line 20]). Mr. Scull and the Bounds were of a like opinion. (I RR., pg. 83, line 3 - pg. 86, line 9; pg. 87, line 19 - pg. 88, line 9; pg. 96, line 2 - pg. 87, line 2). When the Prud'hommes received the deeds, however, they claim that they construed the text as a mineral reservation, assumed that the Bounds had unilaterally changed the parties' agreement and closed the transaction without revealing their assumptions to the Bounds or the Bounds' representatives. (I RR., pg. 116, line 19 - pg. 117, line 11; pg. 118, lines 8 - pg. 119, line 6; pg. 139, line 2 - pg. 140, line 11; pg. 143, line 23 - pg. 145, line 2; pg. 145, line 12 - pg. 146, line 24; pg. 147, line 7 - pg. 149, line 13).

The meaning and legal effect of the text in the quoted portion of the deeds is the basis of this suit. The Bounds claimed that the text creates only an exception to the Grantors warranties under the deeds and that, if it should be construed otherwise, the deeds should be reformed to reflect that the Bounds acquired whatever mineral interest the Grantors owned at the time of the conveyance. (I CR, pp. 9 - 69). In order to circumvent their contractual agreements, the Prud'hommes claimed that the deeds unambiguously reserved their mineral interest and that evidence of contemporary transactions was inadmissable to show that they did not. (1 RR, pg. 8, line 13 - pg. 9, line 6). The trial court ruled that the deed from the E. G. and M. A. Prud'homme

Beneficiaries Partnership unambiguously reserved the minerals to the partnership. (1 RR, pg. 26, line 24 - pg 27, line 23; 1 CR, pg. 9, "Findings of Fact and Conclusions of Law," Conclusions of Law Nos. 1, 2). By contrast, the trial court found that Breen deeds were ambiguous and construed them to convey the grantors' minerals to the Bounds. (1 RR, pg. 26, line 24 - pg. 27, line 23; I Cr, pg. 10, "Findings of Fact and Conclusions of Law," Conclusions of Law Nos. 7 - 11).

## ISSUE NO. 1
### (Restated)

Whether the Trial Court Incorrectly Construed the Deeds from the Prud'hommes to the Bounds to Unambiguously Reserve the Grantors' Minerals.

## SUMMARY OF THE ARGUMENT
### (Under Issue No. 1)

The trial court construed the deed conveying the property in question from the E.G. and M.A. Prud'homme Beneficiaries Partnership to the Bounds as unambiguously reserving the partnership's interest in the oil, gas and other minerals. In doing so, the trial court erred. The deed clearly did not contain an express reservation of minerals by the grantors. The trial court failed to construe the deeds most strongly against the grantor to confer upon the grantee the greatest estate permitted by the terms of the deed and to convey, in the absence of language clearly showing an intention to convey a lesser interest, all of the grantor's interest. The trial court, also, ignored the policy which does not favor reservations or exceptions by implication. The trial court's construction

of the partnership deed is inconsistent with its construction of the other deeds executed as part of the parties' contract. If the deeds are construed in the light of the facts and circumstances surrounding their execution, it becomes clear that the text in question was intended as a limitation of the grantors' warranty and not intended as a mineral reservation or exception. A proper application of the traditional rules of construction dictate that the text in question should have been construed as unambiguously limiting the grantors' warranties.

## ARGUMENT AND AUTHORITIES
### (Under Issue No. 1)

The trial court construed the deed conveying the property in question from the E.G. and M.A. Prud'homme Beneficiaries Partnership to the Bounds as unambiguously reserving the partnership's interest in the oil, gas and other minerals. (I RR., pg. 26, line 23 - pg. 27, line 4; pg. 27, lines 16 - 23; I CR, pg. 91, "Findings of Fact and Conclusions of Law," Conclusion of Law Nos. 1-2). The trial court erred in its construction.

Construction of an unambiguous deed is a question of law for the court. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). Contract language is not ambiguous when it can be given a certain or definite meaning and the court is obligated to interpret the language as a matter of law. *Coker v. Coker*, 650 S.W. 2d 391, 393 (Tex. 1983). A term is not ambiguous because of a simple lack of clarity, nor does an ambiguity arise merely because parties to an agreement proffer different interpretations of a term. *Dewitt County Electric Coop. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1998). An ambiguity results if the application of

established rules of construction leaves the agreement susceptible to more than one meaning. *Id*. Both potential meanings must be reasonable. *Id*. The ultimate purpose in construing a deed is to ascertain the intention of the grantor. *Luckel v. White*, 819 S.W.2d *at* 461; *Smith v. Allison*, 157 Tex. 220, 229, 301 S.W.2d 608, 614, (1956). When this intention is ascertained, that construction which carries the intention into effect governs and controls. *Smith v. Allison*, 157 Tex. *at* 229, 301 S.W.2d *at* 614.

As a matter of law, the Prud'homme partnership deed did not unambiguously reserve the grantors' minerals. The deeds in question were prepared from a State Bar of Texas form. (II RR, Exhibit P-27, pg. 11 [pg. 44, lines 10 - 20]). The text that the trial court found to be an unambiguous began with a heading supplied by the form that read, "Reservations from and Exceptions to Conveyance and Warranty." (II RR, Exhibit P-27, pg 12 [pg. 47, lines 19 - 25]). The quoted text is a heading and, in the absence of any other following text, would clearly not, of itself, create any legal rights or relationships between the grantors and the grantee. The subject referenced in the heading was not limited solely to "reservations." The references are to four different and distinct aspects of Deeds.

Although they are often used interchangeably, the words "exception" and "reservation are not strictly synonymous. *Pich. v. Langford*, 157 Tex. 335, 342, 302 S.W.2d 645, 650. (1957). A "reservation" is a creation by and on behalf of the grantor, of a new right issuing out of the thing granted that did not exist

before the grant. *Pich v. Langford,* 157 Tex. *at* 343, 302 S.W.2d *at* 650; *Bagby v. Bredthauer,* 627 S.W.2d 190, 195, (Tex. App. –Austin, 1981, no writ). On the other hand, an "exception" is an exclusion from the grant in favor of the grantor only to the extent that such interest as is excepted may then be vested in the grantor and not outstanding in another. *Pich v. Langford,* 157 Tex. *at* 343, 302 S.W.2d *at* 650; *Bagby v. Bredthauer,* 627 S.W.2d *at* 195.

Likewise, there is a distinction between a "conveyance" and a "warranty." A "conveyance" is a voluntary transfer of a right or of property. *Blacks Law Dictionary* (10th ed. 2014). It is equivalent to the noun, "grant." *see Blacks Law Dictionary,* (10th ed. 2014). A "warranty," on the other hand, is a separate covenant from the grant and is not a part of the conveyance; It neither strengthens, enlarges nor limits the title conveyed but is a contract on the part of the grantor to pay damages in the event of failure of title. *Bass v. Harper,* 441 S.W.2d 825, 827, (Tex. 1969).

If the heading would have no legal significance without following text expressing the parties' intentions, what text did the deeds contain that unambiguously expressed the parties intent for the Prud'hommes to reserve their minerals? The text following the heading in the Prud'hommes' deed read, "TITLE to any of the oil, gas and other minerals, in, under and that may be produced from the above-described real property, together with all rights, privileges and immunities relating thereto . . ." followed by specific references to reservations by the prior owners in two instruments appearing earlier in the

Prud'hommes' chain of title. (II RR, Plaintiffs' Exhibits 5 - 9). The text used closely tracked the text that the Bounds' title insurer used to exclude mineral ownership from the title insurance coverage. (II RR., Exhibit D-23, page PRU_0127, Schedule B, paragraph 9(f)). The deeds' text is not a complete sentence and contains no verb. The language in the title insurance commitment was part of paragraph 9(f) of Schedule B, Exceptions from Coverage, that began, "In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, cost, attorney's fees, and expenses resulting from:" followed by a list of numerous matters, one of which was the disclaimer of coverage for the title to the minerals. The text of paragraph 9(f) was part of a sentence that expressly related the language to what the insurance would or would not cover. Unlike the commitment, the text of Prud'hommes' deeds was not part of a clearly articulated statement identifying what was to be done about the title to the minerals. There is no express declaration that the grantors "reserve" to themselves the "title to" the mineral interests nor that they "excepted" the "title to" the mineral interests from the conveyance. The text merely refers to the "title to" the oil, gas and other minerals, without mentioning a "reservation" or an "exception." There is nothing in the paragraphs following the heading that would clearly specify that a reservation or exception of the title to the minerals was intended by the grantors rather than merely a limitation of the grantors' warranty of title with respect to the minerals. In order to construe the text otherwise than as only a limitation of the grantors' warranty, the trial court had

to complete the sentence by supplying the missing subject and verb, "Grantors reserve . . ." title to the oil, gas and other minerals.  Such a construction in the absence of express words or some other affirmative expression indicating that the title to the minerals was to be reserved or excepted from the both the conveyance and warranty, and not just the grantors' warranty, is arbitrary.  A court must construe the instrument as it is written and has no right to alter it by interpolation or substitution. *Alford v. Crum*, 671 S.W.2d 870, 872, (Tex. 1984).

If a deed is not ambiguous, it is to be construed under the "four corners" rule. *Luckel v. White*, 819 S.W.2d *at* 461.  The court, when seeking to ascertain the intention of the parties, attempts to harmonize all parts of the deed.  Id.  If a deed is worded in such a way that a court may properly give it a certain or definite legal meaning or interpretation, it is not ambiguous. *Johnson v. Conner*, 260 S.W.3d 575, 579 (Tex. App. –Tyler, 2008, no pet.).  There are a number of applicable construction aids that courts have consistently employ to determine the meaning of the language in a deed.  Deeds are construed most strongly against the grantor. *Garrett v. Dills*, 157 Tex. 92, 95, 299 S.W.2d 904, 906 (1957); *Farm & Ranch Investors, Ltd., v. Titan Operating, L.L.C.*, 369 S.W.3d 679, 681 (Tex. App. –Ft. Worth, 2012, pet. denied); *City of Stamford v. King*, 144 S.W.2d 923, 927 (Tex. Civ. App. –Eastland, 1940, writ ref'd.).  A deed will be construed to confer upon the grantee the greatest estate that the terms of the instrument will permit. *Lott v. Lott*, 370 S.W.2d 463, 465 (Tex. 1963); *Waters v. Ellis*, 158 Tex. 342, 312 S.W.2d 231, 234 (1958).  A general warranty deed conveys all of

the grantor's interest unless there is language in the instrument that clearly shows an intention to convey a lesser interest. *Johnson v. Connor*, **260 S.W.3d at 579**. The courts do not favor reservations by implication. *Sharp v. Fowler*, **151 Tex. 490, 494, 252 S.W.2d 153, 154 (1952)**; *see* TEX. PROP. CODE, § 5.01(a) (mandating that, "An estate in land that is conveyed . . . is a fee simple unless the estate is limited by <u>express</u> words. . . [emphasis added]).

The trial courts finding that the Prud'hommes' deed contains an unambiguous reservation of the minerals finds no support by an examination of the deed's "four corners." The form's granting clause states that the Grantor, ". . . subject to the reservations from and exceptions to conveyance and warranty, grants, sells and conveys to the Grantee, the property." The principal function of the "subject to" clause in the conveyance is to protect the grantor against a claimed breach of warranty. *Walker v. Foss*, **930 S.W.2d 701, 706 (Tex. App. –San Antonio, 1998, no writ)**. Subject to" in its ordinary sense means "limited by" or "subordinate to" and does not have the effect of creating any affirmative rights. *Id*. In conveyances, "subject to" is a term of qualification and does not create new interests. *Id*. If use of the phrase, "subject to," creates no new interest, it cannot create any new right in favor of the grantor that is consistent with the definition of a "reservation" where no such right was created under the "Reservations and Exceptions from Conveyance and Warranty" clause. Nor can it preserve for the grantor a right included within the description of the "property" conveyed that is not expressly excluded from the

conveyance, either by the definition of the property conveyed or by the provisions of the clause in question. The deed's warranty clause contains none of the ambiguities discussed above. It clearly binds the grantor to warrant the title conveyed, ". . . except as to the reservations from and exceptions to conveyance and warranty," thereby excluding those matters from breach of warranty claims. Looking at the whole instrument, what is apparent is that it did <u>not</u> clearly and expressly reserve the minerals to the grantors or except the minerals from the conveyance. Because it did not, the only method by which the deed could be construed to contain a reservation in the grantors' favor is to imply that a reservation was intended. That implication violates the rules of construction that require a reservation or exception to be made in clear and express terms and that, in the absence of clear and express terms, the deed should be construed to convey the greatest possible estate.

If the circumstances involving the negotiation for and preparation of the deeds are considered, the proper construction of the deeds' text becomes a matter of certainty. A trial court is properly authorized to examine those circumstances. A written contract must be construed to give effect to the parties' intent expressed in the text as understood in the light of the facts and circumstances surrounding the contract's execution. *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011). The parole evidence rule applies when parties have a valid, integrated written agreement and precludes enforcement of prior or contemporaneous agreements.

*Id*.  The rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text.  *Id*.  Under generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another.  *Dewitt County Electric Coop. v. Parks*, 1 S.W.3d *at* 102.  The negotiations of the parties may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole.  *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 at 469 - 470.

Both Bounds and the Prud'hommes' agree that the Prud'hommes initial offer to sell the property in question included the sale of the minerals and did not provide that the Prud'hommes would reserve the minerals.  (I RR, 38, line 3 - pg. 40, line 4; pg. 73, lines 9 - 21; pg. 121, lines 8 - 24; pg. 122, line 15 - pg. 123, line 20; II RR, Plaintiff's Exhibit 28; Exhibit P-27, pg. 17 [pg. 65, line 25 - pg. 66, line 12]).  When an agreement for the sale had been concluded, a written contract was prepared which provided that the Prud'hommes would convey ". . . [a]ll minerals owned . . ."  (I RR, pg. 35, line 20 - pg. 36, line 18; pg. 74, lines 11 - 23; pg. 76, line 16 - pg. 78, line 6; pg. 112, line 25 - pg. 113, line 23; pg. 121, lines 8 - 17; pg. 125, lines 2 - 4; II RR, Plaintiffs' Exhibit 21).  The deeds to be used to close the transaction were prepared by John Griffin, an experienced attorney whose practice included real estate transactions.  (II RR, Exhibit P-27, pg. 3, [pg. 9, line 8 - pg. 10, line 3]; pg. 7, [pg. 25, lines 6 - 23]; pg. 11, [pg. 42, line 24 - pg.

44, line 20]; pp. 17 - 18, [pg. 68, line 24 - pg. 70, line 17]). The text following the heading in question in all 6 deeds executed by the Prud'hommes or Breens was identical, the only variance in the Breen deeds being the insertion of a sentence between the property description and the heading that expressly stated that the deed was intended to convey all of the grantor's interest in the above-described property. (II RR., Plaintiff's Exhibits 5 - 9). Although the Breen deeds contained a more specific declaration of the grantors' intent, the trial court found them to be ambiguous and construed them to convey the grantors' mineral interests. (I CR., pp. 92 - 93, "Findings of Fact and Conclusions of Law," Conclusion of Law No. 7 - 11). The trial court offered no explanation for the inconsistent construction of same text in the Prud'homme partnership deed and the Breen deeds, although both sets of instruments were executed pursuant to the same agreement and the added statement of the general rule of construction in the Breen deeds that would have been implied even if it had not been specifically stated was the only difference in two the sets.

From the beginning, Mr. Griffin was aware that the contract provided that the Prud'hommes were to convey their minerals. (II RR., Exhibit P-27, pp. 7 - 8, [pg. 27, line 14 - pg. 29, line 9]; pg. 17, [pg. 65, line 25 - pg. 67, line 2]). Mr. Griffin explained that, in the area of his practice, none of the title insurance companies offered title insurance coverage for minerals but commonly listed prior transactions concerning the mineral estate. (II RR, Exhibit P-27, 9, [pg. 34, line 10 - pg. 35, line 23]; pg. 19, [pg. 75, line 23 - pg. 76, line 7). When

preparing real estate documents, he commonly relied on the title company for information about the minerals and made the conveyance subject to them. (II RR, Exhibit P-27, pp. 9 - 10, [pg. 35, line 24 - pg. 37, line 8]). If the grantor was to reserve the minerals, he explained, he would include a separate, express statement that the grantors reserve the minerals. (II RR., Exhibit P-27, pp. 12 -13, [pg. 48, line 2 - pg. 49, line 13], pg. 18, [pg. 70, line 18 - pg. 71, line 4]; pg. 18, [pg. 70, line 18 - pg. 71, line 4; pg. 71, lines 6 - 21]).

In preparing the deeds, Mr. Griffin inserted the title insurance commitment's text following the heading dealing with reservations and exceptions. (II RR., Exhibit P-27, pg. 12, [pg. 48, lines 13 - 19]; pg. 13, [pg. 49, line 20 - pg. 50, line 16]). His intention in using the commitment's text was to limit the grantors' warranties. (II RR., pg. 19, [pg. 73, lines 6 - 21]). Mr. Griffin's opinion was that the matters following the heading in question were effective as exceptions to the grantors' warranties, and not reservations of their mineral interest or exceptions from the conveyance. (II RR., Exhibit P-27, pg. 6, [pg. 21, lines 8 - 20]; pg. 7, [pg. 25, lines 6 - 23]; pp. 12 - 13, [pg. 47, lines 12 - 18; pp. 48, line 13 - pg. 49, line 13; pp. 49, line 20 - pg. 50, line 16]; pg. 18, [pg. 71, line 21 - pg 72, line 13]; pg. 19, [pg. 73, line 6 - pg. 74, line 20]).

Because the text of the deed contains no clear and explicit reservation of minerals, it plainly <u>did not</u> unambiguously reserve the grantors' minerals. Viewing the documents in question within their "four corners," the text used after the heading is reasonably capable of construction as a limitation of the

grantors' warranty and the trial court erred as a matter of law in failing to construe it that way. Application of the appropriate rules of construction require this result because of the absence of any clearly expressed reservation or exception and the disfavor of implied reservations or exceptions. The construction of the text following the reservations and exceptions heading only as a limitation of the grantors' warranty gives effect to text consistently with the requirements that deeds are construed most strongly against the grantor to convey the greatest possible estate and avoids the necessity of having to imply the existence words of reservation or exception that were not in fact used in connection with the mineral estate. Construing the text as a limitation of the grantors' warranties, also, avoids inconsistencies in the construction of the other deeds which were part of the same transaction. The correctness of this construction is confirmed by examining the circumstances surrounding the sale that show the intention of the parties, the scrivener's reasons for using the text and his opinion of the meaning of the text used. The trial court, therefore, erred as a matter of law in its construction of the Prud'homme partnership deed.

## ISSUE NO. 2
### (Restated)

Whether the Trial Court Incorrectly Ruled That the Deeds from the Prud'hommes to the Bounds Were Not Subject to Reformation Due to Fraud, Accident, Mistake or Scrivener's Error.

## SUMMARY OF THE ARGUMENT
### (Under Issue No. 2)

The trial court concluded as a matter of law that there was no mutual mistake of the parties in regard to the execution of the deeds in question. The conclusion was based on its findings that the Bounds and the Prud'hommes understanding of the legal effect of the text used in the deeds in question was different and that, as a result, the parties did not have a mutual intent and understanding of the deeds in question. The trial court's conclusion misapplies the law to the facts found. If it was true that the Prud'homme partnership deed unambiguously reserved the grantors' minerals and that the Bounds and Prud'hommes each thought the current agreement contained different terms, the undisputed evidence shows that each of them labored under a common misconception that the deeds complied with the contract that was current in their understanding. That the parties had a different understanding of the terms of the agreement or the meaning of the deeds is not determinative. The mistaken fact was that the deeds complied with the contract and was, therefore, a mutual mistake. The undisputed evidence, moreover, shows that, if the Bounds' mistake was not shared by the Prud'hommes, their mistake, when coupled with the Prud'hommes' silence, was legally equivalent to a mutual mistake. As a result, the trial court's conclusion of law that there was no mutual mistake was not supported by legally sufficient evidence and the only evidence supporting such a conclusion is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

The court concluded as a matter of law that the Bounds did not prove by clear, exact and satisfactory evidence that a mineral reservation was included in the Prud'homme partnership's deed by a mutual mistake of the parties. (1 CR., pg. 92, "Findings of Fact and Conclusions of Law," Conclusion of Law No. 6). The court's legal conclusion was based on its finding that, at the time Gilbert Prud'homme executed the deed dated September 7, 2001, from the E. G. and M. A. Prud'homme Beneficiaries Partnership to the Bounds, he understood that it reserved the minerals in and under the 126 acres to its grantors. (I CR, pg 86, "Findings of Fact and Conclusions of Law," Finding of Fact No. 19). The court, further, found that, although the Bounds believed they were acquiring whatever mineral interest the Prud'hommes owned with respect to the property being purchased, the Prud'hommes believed they were reserving the minerals. (I CR., pg. 90, "Findings of Fact and Conclusions of Law," Findings of Facts Nos. 43 - 44). As a result, the trial court found that the Bounds' and Prud'hommes' did not have an identical intent and understanding at the times the deeds in question were executed. (I CR., pg. 90, "Findings of Fact and Conclusions of Law," Finding of Fact No. 45). The evidence adduced at trial was legally and factually insufficient to support the trial court's findings of fact and conclusions of law.

Findings of fact in a bench trial have the same force and dignity as a jury verdict and are reviewable for legal and factual sufficiency of the evidence by the same standards as applied in reviewing a jury's findings. *Anderson v. City of*

*Seven Points*, 806 S.W.2d 791, 794, (Tex. 1991). To determine whether legally sufficient evidence supports a challenged finding of fact, the reviewing court must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827, (Tex. 2005). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id*. A reviewing court must sustain a legal sufficiency or no evidence challenge when the record discloses one of the following situations: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810.

In reviewing a trial court's findings for factual sufficiency, the reviewing court must weigh all of the evidence in the record and may overturn a finding only if the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Ortiz v. Jones, 917 S.W.2d 770, 772, (Tex. 1996).

Appellate courts review a trial court's conclusions of law *de novo*. *B.M.C. Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794, (Tex. 2002). An appellant may not challenge a trial court's conclusions of law for factual insufficiency; however the reviewing court may review the trial court's legal

conclusions drawn from the facts to determine their correctness. *Id*. Conclusions of law will not be reversed unless they are erroneous as a matter of law. *Tex. Dep't of Pub. Safety v. Stockton*, 53 S.W.3d 421, 423, (Tex. App. —San Antonio 2001, pet. denied).

The underlying objective of reformation is to correct a mutual mistake made in preparing a written instrument, so that the instrument truly reflects the original agreement of the parties. *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379, (Tex. 1987). Reformation requires two elements: (1) an original agreement; and (2) a mutual mistake, made after the original agreement, in reducing the original agreement to writing. *Id*. A party is, therefore, entitled to reformation of a deed when it proves that it reached an agreement with the other party but the deed does not reflect the true agreement due to a mutual mistake. *Hardy v. Bennefield*, 368 S.W.3d 643, 650, (Tex. App. –Tyler, 2012, no pet.). A mutual mistake is one common to both or all parties, wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provision of a written agreement designed to embody such an agreement. *Hardy v. Bennefield*, 368 S.W.3d *at* 650; *Simpson v. Curtis*, 351 S.W.3d 374, 378 - 379, (Tex. App. –Tyler, 2010, no pet.). If a mistake has been made by a scrivener or typist, an instrument may be reformed and modified by a court to reflect the true agreement of the parties, if the mistake was a mutual mistake. *Simpson v. Curtis*, 351 S.W.3d *at* 379. A mutual mistake is generally established from all of the facts and circumstances surrounding the parties and the execution of the

instrument.  *Id*.  The parole evidence rule does not bar extrinsic proof of a mutual mistake.  *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990).  Reformation is unavailable, however, unless the party claiming mutual mistake presents "clear, exact and satisfactory evidence."  *Hardy v. Bennefield*, 368 S.W.3d *at* 648.

If this court determines that the Prud'hommes' deeds unambiguously reserved the grantors' minerals, the evidence that they did so as the result of a mutual mistake or scrivener's error is clear, exact and satisfactory.  The Prud'hommes' own testimony establishes the mutual mistake.  It is undisputed that the parties entered into a sales contract that required the Prud'hommes to convey their minerals to the Bounds.  When Gilbert Prud'homme, the partner's general manager, signed the contract, he expressly agreed on behalf of the partnership to convey whatever minerals the partnership owned.  (I RR, pg. 113, lines 7 - 23; pg. 121, line 8 - pg. 125, line 4).  After the sales contract was signed, the title insurance company raised an objection to the property's title and required a conveyance from all of the individual partners of the E. G. and M. A. Prud'homme Beneficiaries Partnership, including Eleanor P. Breen, who was then deceased.  (I RR, pg. 114, lines 6 - 15; pg. 116, line 19 - pg. 117, line 11; pp. 122 - 131; II RR., Plaintiffs' Exhibit 4; Exhibit D-23, pg. PRU_0122, Schedule A, paragraph 3; pp. PRU_0128 - 0129, Schedule C, paragraph 4(g)).  Deeds were prepared by John Griffin and sent by him or by the title company to Gilbert Prud'homme.  (II RR., Exhibit P-27, pg. 11, [pg. 42, line 24 - pg. pg. 44, line 20]).

Mr. Prud'homme received the deeds on September 7, 2001. (I RR, pg. 139, lines 2 - 6). When he received the deeds, Mr. Prud'homme reviewed them and assumed from their text that the grantors were reserving the minerals. (I RR., pg. 118, lines 8 - 17). Although he was aware that the original contract provided that the Bounds were to get the minerals, he did not immediately call this matter to the attention of Mr. Griffin, the Bounds or Mr. Crawford, but, rather, assumed that the terms of the sale had changed and did nothing. (I RR., pg. 118, 18 - pg. 119, line 6; pg. 139, line 2 - pg. 140, line 11). Mr. Prud'homme was aware that the sales contract pursuant to which deeds had been prepared clearly stated that, "Closing of the sale will be on or before September 2, 2001, or within 7 days after objections to matters disclosed in the Commitment . . . have been cured, <u>whichever date is later</u>," [emphasis added]. (I RR., pg. 147, line 7 - pg. 148, line 14; II RR, Plaintiffs' Exhibit 21 [page 5]). He, also, understood that the title insurance company had required the execution of deeds from the Breen heirs. (I RR., pg. 114, lines 6 - 25; pg. 143, line 15 - pg. 145, line 2; pg. 148, line 8 - pg. 149, line 3). Mr. Prud'homme, nevertheless, presumed incorrectly that the contract had expired even though there had been no communication between Mr. Prud'homme and Mr. Prud'homme's agent, Mr. Crawford, Mr. Griffin or the Bounds and even though the Breens delayed for over a month in signing the deeds. (I RR., pg. 116, line 19 - pg. 117, line 11; pg. 139, line 2 - pg. 140, line 11; pg. 143, line 23 - pg. 145, line 2; pg. 145, line 12 - pg. 146, line 24; pg. 147, line 7 - pg. 149, line 13; II RR., Plaintiff's Exhibits 7 - 9).

When Mr. Prud'homme received the deeds from Mr. Griffin, he forwarded the Breen deeds to the others.  (I RR, pp. 117, line 23 - 118, line 3).  The deed from the partnership and its living members was signed between September 8, 2001, and September 12, 2001, about a month before Mr. Prud'homme tried to confirm his assumption that the terms of the sale contract had changed with any other person.  (I CR, pg. 86, "Findings of Fact and Conclusions of Law," Finding of Fact No. 16).  The Breen deeds were all signed between October 5, 2001, and October 17, 2001.  (II RR., Plaintiffs' Exhibits 6, 7, 8, 8A and 9).  At that time, Mr. Prud'homme had not confirmed with any of the other parties his understanding that the original contract had expired and that the deeds represented a new contract between the Prud'hommes and the Bounds.  He stated that his understanding that the expiration of the contract and the change in the terms of the sales agreement was an "implicit" understanding between him and Mr. Griffin, even though it was never articulated and "just assumed" between Mr. Griffin and Mr. Prud'homme.  (1 RR., pg. 139, lines 7 - 23).  There was no discussion about Mr. Prud'homme's assumptions with any other party to the transaction until mid October, 2001, when he called Mr. Griffin's office to find out if the deeds affected only half of the minerals or all of them.  (I RR., pg. 140, line 12 - pg. 146, line 24).  That discussion was not with Mr. Griffin, nor the Bounds, nor his agent, Mr. Crawford, but with an unidentified girl in Mr. Griffin's office.  (I RR., pg 139, line 24 - pg. 140, line 11; pg. 145, line 12 - pg. 146, line 24).  The only discussion Mr. Prud'homme had

directly with Mr. Griffin related to the Breens reluctance to comply with the title insurance company's requirement that they sign deeds conveying the property to the Bounds. (I RR., pg. 143, line 15 - pg. 146, line 24).

The Bounds understood from the time of the Prud'hommes' initial offer that they were to receive the Prud'hommes' minerals. (I RR., pg. 36, lines 1 - 18; pg. 37, line 22 - pg. 40, line 24; pg. 45, line 7 - pg. 52, line 14; pg. 63, lines 1 - 6; pg. 65, line 7 - pg. 66, line 25). Likewise, the Bounds' son-in-law, Terry Scull, who assisted them in concluding the sale, understood that the Prud'hommes' minerals were to be conveyed. (I RR., pg. 73, lines 9 - 21; pg. 80, line 22 - pg. 81, line 3). Mr. Griffin, who drafted the deeds, knew that the Bounds were to receive the minerals from the time he received the sales contract and discussed that specific fact with Mr. Prud'homme. (II RR., Exhibit P-27, pg. 17, [pg. 65, line 25 - pg. 66, line6]). He did not believe or intend that the deeds would be effective to reserve the Prud'hommes' mineral interests to the grantors. (II RR., Exhibit P-27, pg. 6, [pg. 21, lines 8 - 20]; pg. 7, [pg. 25, lines 6 - 23]; pp. 12 - 13, [pg. 47, lines 12 - 18; pp. 48, line 13 - pg. 49, line 13; pp. 49, line 20 - pg. 50, line 16]; pg. 18, [pg. 71, line 21 - pg 72, line 13]; pg. 19, [pg. 73, line 6 - pg. 74, line 20]). The first time that either he or the Bounds became aware of the Prud'hommes' claim of mineral ownership through a reservation was late in the year, 2010, or early in the year, 2011. (I RR., pg. 47, line 10 - pg. 50, line 2; pg. 81, lines 4 - 16). Even then, upon examination of the documents as a result of the Prud'hommes' claim, Mr. Scull believed that the deeds properly conveyed the

Prud'hommes' minerals to the Bounds. (I RR., pg. 83, line 3 - pg. 86, line 9; pg. 87, line 19 - pg. 88, line 9; pg. 96, line 2 - pg. 87, line 2).

That the text of the deeds that Mr. Griffin prepared in order to complete the contract is subject to reasonable interpretation in different ways is shown in the arguments contained herein under Issue No. 1. That the deeds' text was in fact interpreted in different ways by the Bounds and the Prud'hommes may be inferred by the testimony outlined above. It is clear that, despite Mr. Prud'homme's assumptions about a new agreement, no such contract change was ever discussed with, or agreed to by, the Bounds, or anyone else on their behalf. The Prud'hommes, in this case, seek to avoid their contractual obligations to Bounds by unilaterally choosing to ignore what would have been an obvious mistake in drafting the deeds and then rationalizing that the Bounds had agreed to a contract change that they had never agreed to. Thereafter, by remaining silent about the imaginary contract until the oil companies required curative work on their mineral titles, they insured that the Bounds would not learn of their misappropriation for years. Should this court permit the Prud'hommes assertion of a phantom contract entered into by only one party to the agreement to prevent the assertion of a mutual mistake in drafting the deeds by the other party who did not agree to the change and who had no knowledge of its existence, it will have provided unscrupulous persons a new and convenient vehicle for avoiding their disadvantageous but otherwise legally binding contracts.

Mr. Prud'homme was a lawyer and should have been aware of the requirement that real estate sales contracts must be in writing, yet there is no evidence that he signed such a document containing a new agreement addressing a mineral reservation or requested a copy of it for review. *See*, TEX. BUS. & COM. CODE, §26.01(a), (b)(4). As a lawyer, he should have known that the sales contract expressly provided that the date of closing depended on addressing the title insurance company's requirements, but chose to ignore those requirements when he unilaterally decided that the contract under which the curative deeds had been sent to him had expired. And, as a lawyer, he should have known that his silence in the face of an apparent mistake in the drafting of the deeds would be justification for reforming the deeds. *See Davis v. Grammar*, 750 S.W.2d 766, 768, (Tex. 1988) (holding that a unilateral mistake by one party, and knowledge of that mistake by the other party, is equivalent to mutual mistake). Nevertheless, without taking the precaution of verifying his assumptions, but keeping them to himself, Mr. Prud'homme presumed that the deeds were sent pursuant to a new agreement that he had not made with the Bounds.

The only mutual agreement between the parties to the deed was reflected in the original sales contract. Both the Bounds and the Prud'hommes were, however, under the impression that the deeds followed the terms of their sales agreement. If both parties were wrong in their assumption, then both parties labored under the same misconception that the deeds correctly reflected the current agreement. *See Simpson v. Curtis*, 351 S.W.3d *at* 379. Mr. Prud'homme,

moreover, believed that the deeds failed to comply with the written sales contract, but did not advise the Bounds of this circumstance. Even if the Bounds' understanding of the documents was a unilateral mistake, it amounts to a mutual mistake when coupled with the Prud'homme's silence with regard to the failure of the documents to comply with the contract. *See Davis v. Grammar*, **750 S.W.2d** *at* **768**. The trial court's findings of fact that the parties to the sale did not have the same understanding of the agreement do not, therefore, address the issue of whether they labored under a mutual mistake. There was no credible evidence that either of the parties did not think that the deeds effectively complied with their existing real or imagined agreements. Mr. Prud'homme's testimony conclusively establishes that he believed the deeds were drawn in conformity to a new contract that the Bounds had offered but that he remained silent about his assumptions. Because it's findings of fact were not supported by legally and factually sufficient evidence, the trial court's conclusion that there was no mutual mistake was an error of law.

### ISSUE NO. 3
#### (Restated)

Whether the Trial Court Incorrectly Ruled That the Statute of Limitations Barred the Bounds from Seeking Relief by Way of Reformation.

### SUMMARY OF THE ARGUMENT
#### (Under Issue No. 3)

The evidence was legally and factually insufficient to support the trial court's findings that the Bounds were on notice that the Prud'hommes' deeds

contained a mineral reservation from at least the time they received their title insurance policy. The unchallenged evidence establishes that the Bounds reasonably construed the deeds to convey all of the Prud'hommes' mineral interests and had no actual notice of the Prud'hommes' construed the deeds otherwise until less than 3 years before this suit was filed. The Prud'hommes did not inform the Bounds of their interpretation of the deeds or their imagined new agreement concerning the minerals until December, 2010. The title insurance policy issued to the Bounds does not provide any greater notice of the Prud'hommes' claim than a reading of the deeds would give and does not excuse the Prud'hommes' silence with regard to their assumptions about the changed contract terms.

## ARGUMENT AND AUTHORITIES
### (Under Issue No. 3)

The trial court found that the Bounds failed to exercise reasonable diligence to discover that the deeds in question did not convey the Prud'hommes' minerals because they had constructive notice of the contents of the deeds from the time they were delivered to the Bounds or from the time they received their title insurance policy. (I CR., pp. 90 - 91, "Findings of Fact and Conclusions of Law," Findings of Fact Nos. 46 - 48). Based on those findings, the trial court concluded as a matter of law that the statute of limitations bars Bounds' action for reformation of the deed. (I CR., pg. 92, "Findings of Fact and Conclusions of Law," Conclusions of Law Nos. 3 - 5). The trial court erred as a matter of law in concluding that the statute of limitations had run because its findings of fact

**page 32**

are supported by legally and factually insufficient evidence.

The Prud'hommes claim that the Bounds suit is barred by the four year statute of limitations.  A suit for reformation of a deed is governed by the four year statute of limitations.  TEX. CIV. PRAC. & REM. CODE, §16.051; *Brown v. Havard*, 593 S.W.2d 939, 943, (Tex. 1980).  The frequently stated rule is that a party is charged with knowledge of the contents of his deed from the date of its execution, and that limitations begins to run on such date against any action to correct it.  *See  Sullivan v. Barnett*, 471 S.W.2d 39, 45, (Tex. 1971).  This rule has not been strictly applied in the past and courts have noted numerous exceptions over the years.  *Id. at* 45 - 46.  The presumption can be rebutted and there are various circumstances which will excuse a delay in discovery of the mutual mistake.  *Id. at* 45.  Once the presumption of immediate knowledge is rebutted, however, the statute of limitation will begin to run when the mutual mistake was, or in the exercise of reasonable diligence should have been, discovered.  *Brown v. Havard*, 593 S.W.2d *at* 944; *Sullivan v. Barnett*, 471 S.W.2d *at* 45).  As between the original parties to a transaction, the statute of limitation does not commence to run against actions for cancellation and reformation of deeds on the basis of mutual mistake and fraud until four years after the mistake was, or in the exercise of reasonable diligence should have been, discovered.  *Sullivan v. Barnett*, 471 S.W.2d *at* 47).  The question of when a mistake should have been discovered is one of fact.  *Brown v. Havard*, 593 S.W.2d *at* 944.

The Bounds' action for reformation is not barred under the four year

statute of limitations. The trial court's findings of fact assume that the Bounds were "on notice" of the Prud'hommes' claimed mineral reservation from the date of the execution of the deeds or the receipt of their title insurance policy from the title company. The trial court returned no other finding of fact with respect to when the Bounds discovered, or could have, in the exercise of reasonable diligence, discovered that the deeds failed to transfer the Prud'homme's minerals.

The facts are largely undisputed. The Bounds received copies of their deeds and their title insurance policy at or before November, 2001. As explained in the argument under Issue No. 1, the deeds in question did not clearly and expressly reserve the minerals to the grantors. They were not so plainly worded that resort to the rules of construction and the examination the contemporary background of the transaction are not needed to explain their meaning. Although Mr. Prud'homme was a lawyer, the Bounds were not and had no experience in real estate matters. (I RR., pg. 31, lines 12 - 25; pg. 67, lines 1 - 7). They did not possess the sophistication necessary to determine the meaning of the text in the deeds or the title insurance policy and had to rely on the opinion of others. (I RR., pg. 32, lines 6 - 15; pg. 64, line 3 - pg. 65, line 6; pg. 66, lines 5 -12). Their son-in-law, upon whom the Bounds relied and who was better acquainted with the legal aspects of land ownership, and Mr. Griffin, the lawyer who prepared the deeds, believed that the text amounted only to an exclusion of minerals from the Prud'hommes' warranties, and not a mineral reservation. (1

RR., pg. 95, line 15 - pg. 97, line 2; Exhibit 27, pg. 6 [pg. 21, lines 8 - 20]; pg. 7, [pg. 25, lines 6 - 12]; pp. 12 - 13 [pg. 47, line 7 - pg. 49, line 13). Because they both believed that the deeds were effective to convey the minerals, no inquiry of them would have revealed any reason to believe the Prud'hommes possessed a contrary claim. (I RR., pg. 45, lines 14 - 18). If professions dealing with such matters on a regular basis would have formed an opinion that the deeds did not reserve the minerals, it is unreasonable to expect that the Bounds, who had no experience in or understanding of these matters, to be placed on notice that the Prud'hommes might claim that the effect of the language in the deeds was to reserve the grantors' minerals.

The Prud'hommes admitted that they failed to talk to the Bounds, Mr. Griffin or to Mr. Gorham about their changed understanding of the sale terms, thus permitting them to believe that the original offer to convey their minerals had not been withdrawn or superceded . (1 RR., pg. 139, line 7 - pg. 146, line 24). The Prud'hommes presented no evidence of any new contract to which the Bounds had expressly agreed, either directly or through their representatives, to complete the sale on the terms that Mr. Prud'homme imagined. The only contact that Mr. Prud'homme had with anyone about the text relating to the minerals was a conversation he alleges he had with an unidentified girl in Mr. Griffin's office, whose authority and competence was not shown, in which he inquired, "Whats the deal. Do you understand? Whats the deal. Is it a half interest or is it a full interest?" (I RR., pg. 140, lines 20 - 23). Although Mr.

Prud'homme documented many of his contacts with Mr. Griffin in his time sheets, they did not show this discussion and Mr. Prud'homme depended on his recollection to fix the time at which the discussion occurred.  (I RR., pg. 141, line 10 - pg. 143, line 14).

There is nothing to impeach the Bounds evidence that they lacked actual knowledge of the Prud'homme's claim.  The Bounds were unaware that the Prud'homme defendants claimed to own the minerals under the property in question until December, 2010.  On that date, they received a telephone call from Gilbert Prud'homme requesting the Bounds to execute a correction deed to the property to correctly state the terms of the conveyance with respect to the minerals.  (I RR., pg. 47, line 10 - pg. 50, line 24; pg. 51, line 22 - pg. 52, line 14; pg. 95, line 15 - 20; pg. 80, line 22 - pg. 83, line 2; pg. 87, line 19 - pg. 88, line 9; pg. 92, line 8 - pg. 93, line 1; pg. 95, lines 15 - 20; II RR., pg. 5, [pg. 18, line 9 - pg. 20, line 12], pg. 6, [pg. 21, line 8 - pg. 22, line 17; pg. 23, line 4 - pg. 23, line 22]).  In that call and his subsequent dealings, Mr. Prud'homme suggested that the minerals should be split, even though he believed the assumed new agreement had permitted the grantors to keep all of their minerals.  (I RR., pg. 49, line 15 - pg. 50, line 2; pg. 80, line 22 - pg. 61, line 16; pg. 87, line 25 - pg. 88, line 9; II RR., pp. 19 - 20, [pg. 76, lines 9 - 22; pp. 77, line 8 - pg. 78, line 8]).  In January, 2011, the Bounds declined Mr. Prud'homme's request.  (I RR., pg. 47, line 25 - pg. 49, line 20; pg. 87, line 25 - pg. 88, line 12).

Mr. Prud'homme's communication prompted the Bounds to search the

real estate records, where it was discovered that the Prud'hommes had leased the mineral interest under the property they had sold. (I RR., pg. 80, line 22 - pg. 83, line 2; pg. 88, line 19 - pg. 90, line 12). This suit was filed October 28, 2013, less than four years after Mr. Prud'homme first made the Bounds aware that the original deeds required revision because of the mistake in drafting the provisions relating to the minerals.

The Prud'hommes assert that the Bounds were placed on notice of the Prud'hommes' mineral reservations because of the statements contained in the title insurance policy they received by November of 2001. Schedule B of that title insurance policy listed numerous exceptions from insurance coverage. That schedule provided, as follows:

> "This policy does not insure against loss of damage . . . which arise by reason of . . . the following matters:
>
> * * *
>
> "6.    The following matters and all terms of the documents creating or offering evidence of the matters . . .:
>
> > "f.    Title to any of the oil, gas and other minerals in, under and that may be produced from the insured premises. The following is provided for informational purposes only:
> >
> > * * *
> >
> > "(iii)  Mineral Reservation as set forth in multiple Warranty Deeds from Eck G. Prud'homme, et al, to Walter Bounds and wife, Carolyn B. Bounds, all dated September 7, 2001, and recorded in the Real Property Records of San Augustine County, Texas, as follows: Vol. 24, Page 20; Vol. 24, Page 25; Vol. 24, Page 28; Vol. 24, Page 31; Vol. 24, Page 34; and Vol 24, Page 37;
>
> "Title to said interests has not been investigated subsequent to the dates of the aforesaid instruments."

It may be initially observed that the title insurance policy itself was a

contract between the Bounds and third parties, and not the Prud'hommes.  A fair summary of the meaning of the text is that the policy doesn't insure the title to the oil, gas and other minerals.  The subject addressed by the language, therefore, is the general exclusion of the liability of the title insurance company for failure to the title to any of the minerals, and not specific title defects.  The language relied upon by the Prud'hommes as notice to the Bounds appears after a statement that the following references are given for informational purposes only.  If the following references had been omitted, the title insurance coverage would still not have included the specific matters referred to and, as far as the policy was concerned, the additional text was surplusage.

The last reference in the title insurance policy was to the "mineral reservation" contained in the Prud'hommes' deeds to the Bounds.  Those deeds were not so plainly written that their meaning was obvious upon inspection.  As shown above in the Bounds' argument under Issue No. 1, the text of those deeds was not clearly a "reservation" and requires consideration of additional factors to construe correctly.  If the Bounds possessed the same legal understandings as Mr. Scull and Mr. Griffin, an inspection of those deeds would have produced the opinion that they were exceptions from the grantors' warranties, and not reservations. Neither the references in the title insurance policy or the text of the deeds, even if they could be read to permit the Prud'hommes assert a claim to the minerals, gave any notice that the Prud'hommes, in fact, were claiming them. The fact that the third party instrument mischaracterized the effect of the deeds'

text might put the Bounds on notice that their title insurance would not pay for their loss of the minerals, but would not give notice that the Prud'hommes claimed to reserve the minerals. This is particularly true where the text of the deeds is unclear. The Prud'hommes cannot, in this case, rely on a third party to provide the disclosure to the Bounds that they were obligated to give but did not give until December, 2010. The text, even if it could be read to permit the Prud'hommes assert a claim to the minerals, gave no notice that they, in fact, were claiming them.

The only evidence, therefore, in this case establishes that the Bounds, and those who advised them, reasonably believed that the deeds from the Prud'hommes were effective to comply with their sales contract's requirement for the Prud'hommes to convey all of their minerals, that the Prud'hommes believed or came to believe that the deeds represented a new contract between the parties that permitted them to keep their minerals, but that the Prud'hommes remained silent about their assumptions and did not apprise the Bounds of their claims until at least December of 2010. Consequently, the evidence offered to show when the Bounds were on notice of the possible claim that the deeds contained a mineral reservation conclusively establishes that the text of the deeds was not so clear and express that it unambiguously gave notice of a reservation, that, before December, 2010, the Bounds were not aware that the Prud'hommes might have a possible claim that the text reserved their mineral interest, that the Prud'hommes remained silent about their claim

throughout that time and that this suit was filed within four years of when the Bounds first learned, or could have learned through the exercise of reasonable diligence, of the Prud'hommes' claim. There was no evidence that the Bounds had actual notice of the claim prior to Mr. Prud'hommes contact in December of 2010, and any contradictory evidence there may have been was no more than a mere scintilla. The trial court's findings that the Bounds had notice of the reservation by at least November of 2001 is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

## CONCLUSION AND PRAYER

The trial court erred as a matter of law in construing the deed in question to unambiguously reserve the grantors' minerals and in failing to construe the deed as a limitation of the grantors' warranty.

The evidence was legally and factually insufficient to support the trial court's findings of fact that the parties did not labor under a mutual mistake and the trial court erred as a matter of law in concluding that an action for reformation of the deeds based on a mutual mistake of the parties would not lie.

The evidence was legally and factually insufficient to support the trial court's findings of fact upon which it's legal conclusion that the Bounds suit is barred by the statute of limitations and the trial court erred as a matter of law in so concluding.

For the reasons enumerated above, Appellant prays this court, alternately, to enter its orders:

Modifying the trial court's judgment to award Appellant recovery against the Appellees, John Thomas Prud'homme, Joseph Gilbert Prud'homme, Joseph Lynn Prud'homme, Peter A. Breen, Individually and as Successor Trustee of the Breen Family Trust, Janet M. Sutro, Susan E. Breen, and Terrance E. Breen, Individually and d/b/a E. G. and M. A. Prud'homme Beneficiaries Partnership, of the title to and possession of an undivided fifty percent, (50%), of the oil, gas and other minerals situated in, on or under the real property described in the trial court's judgment, or otherwise modifying said judgment, and affirming the judgment as modified;

Reversing the judgment of the trial court, in whole or in part, and rendering the judgment that the trial court should have rendered; or

Reversing the judgment of the trial court, in whole or in part, and remanding this cause for further proceedings in the trial court consistent with this court's orders or the interests of justice;

Taxing costs herein against Appellee; and

Granting such other and further relief to Appellant as they may show themselves entitled.

Respectfully Submitted:

Thomas R. McLeroy, Jr.
P. O. Box 668
Center, Texas  75935
(936) 598-2701
FAX (936) 598-6086

BY: /s/ Thomas R. McLeroy, Jr.
Attorney for Appellant.

## CERTIFICATE OF COMPLIANCE

In compliance with TEX. R. APP. P., 9.4(i)(3), I certify that the word-count of the foregoing brief is 10,712 words.

/s/ Thomas R. McLeroy, Jr.
_____
Attorney for Appellant

## CERTIFICATE OF SERVICE

In compliance with TEX. R. APP. P., 9.5, I hereby certify that service of the foregoing pleading was this date made upon counsel for all parties to this appeal as follows:

| Date | Manner of Service | Name and Address of Persons Served |
|---|---|---|
| 9/22/2015 | eservice | Mr. Robert G. Hargrove<br>Osborn, Griffith & Hargrove<br>515 Congress Avenue, Suite 2450<br>Austin, Texas 78701<br>(512) 476-3529<br>FAX (512) 476-8310<br>rob@texasenergylaw.com<br>Bar No. 24032391 |

/s/ Thomas R. McLeroy, Jr.

Attorney for Appellant

**TAB 1**
**(Trial Court's Judgment)**

Cause No. CV-13-9488

| | | |
|---|---|---|
| WALTER BOUNDS and wife, | § | IN THE DISTRICT COURT |
| CAROLYN B. BOUNDS, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JOHN THOMAS PRUD'HOMME, | § | |
| JOSEPH GILBERT PRUD'HOMME, | § | SAN AUGUSTINE COUNTY, |
| JOSEPH LYNN PRUD'HOMME, | § | TEXAS |
| PETER A. BREEN, Individually and as | § | |
| Successor Trustee of the BREEN FAMILY | § | |
| TRUST, JANET M. SUTRO, SUSAN E. | § | |
| BREEN, and TERRANCE E. BREEN, | § | |
| Individually and d/b/a E.G. AND M.A. | § | |
| PRUD'HOMME BENEFICIARIES | § | |
| PARTNERSHIP, | § | |
|     Defendants. | § | 1st JUDICIAL DISTRICT |

**FILED**
AT 2:0 O'CLOCK P M
7-16 20 15
JEAN STEPTOE District Clerk
SAN AUGUSTINE, TEXAS
BY _____

## JUDGMENT

On February 25, 2015, this cause came on to be heard. Walter Bounds and wife, Carolyn Bounds, Plaintiffs, appeared in person and by attorney of record and announced ready for trial, and John Thomas Prud'homme, Joseph Gilbert Prud'homme, Joseph Lynn Prud'homme, Peter A. Breen, Individually and as Successor Trustee of the Breen Family Trust, Janet M. Sutro, Susan E. Breen, and Terrance E. Breen, Individually and d/b/a/ E.G. and M.A. Prud'homme Beneficiaries Partnership, Defendants, appeared in person and by attorney of record and announced ready for trial. No jury having been demanded, all questions of fact were submitted to the Court, and the case proceeded to trial.

The Court, after hearing the evidence and arguments of counsel, is of the opinion and finds that:

Vol. WW pg. 627

(a)     the Warranty Deed dated September 7, 2001, by and between Eck. G. Prud'homme, Jr., Al Joseph Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, d/b/a E.G. and M.A. Prud'homme Beneficiaries Partnership, as Grantors, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 20, and admitted in evidence as Plaintiffs' Exhibit 5, is not ambiguous, and is hereby construed to reserve to its Grantors any and all oil, gas, and other minerals owned by its Grantors with respect to the property conveyed by the deed;

(b)     the Plaintiffs should take nothing with respect to their cause of action to reform the deed described above and admitted as Plaintiffs' Exhibit 5;

(c)     the Warranty Deed dated September 7, 2001, by and between Hal Joseph Breen, a single person, Individually and as Trustee of the Breen Family Trust and Personal Representative under the Last Will of Eleanor P. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 25, and admitted in evidence as Plaintiffs' Exhibit 6, is ambiguous, and is hereby construed to convey to its Grantees any and all oil, gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed;

(d)     the Warranty Deed dated September 7, 2001, by and between Peter A. Breen, Individually and as Successor Trustee of the Breen Family Trust, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 28, and admitted in evidence as Plaintiffs' Exhibit 7, is ambiguous, and is hereby construed to convey to its Grantees any and all oil,

gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed;

(e) the Warranty Deed dated September 7, 2001, by and between Susan E. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 31, and admitted in evidence as Plaintiffs' Exhibit 8, is ambiguous, and is hereby construed to convey to its Grantees any and all oil, gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed;

(f) the Warranty Deed dated September 7, 2001, by and between Terence J. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 34, and admitted in evidence as Plaintiffs' Exhibit 8A, is ambiguous, and is hereby construed to convey to its Grantees any and all oil, gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed;

(g) the Warranty Deed dated September 7, 2001, by and between Janet M. Breen Sutro, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 37, and admitted in evidence as Plaintiffs' Exhibit 9, is ambiguous, and is hereby construed to convey to its Grantees any and all oil, gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed;

(h) for purposes of this cause, the Deed dated May 22, 1971, by and between E.G. Prud'homme, Sr. and wife, Mary Anderson Young Prud'homme, as Grantors, and Eck. G. Prud'homme, Jr., Eleanor Prud'homme Breen, John Thomas Prud'homme, Joseph

Gilbert Prud'homme, and Joseph Lynn Prud'homme DBA the E.G. and M.A. Prud'homme Beneficiaries Partnership, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 166, Page 239, and admitted in evidence as Plaintiffs' Exhibit 3, is the common source of title for the property described in Exhibit A to this Judgment. At the time of this Deed, E.G. Prud'homme, Sr. and wife, Mary Anderson Young Prud'homme owned an undivided fifty percent (50%) interest in the oil, gas, and other minerals in and to the property described in Exhibit A to this Judgment;

(i)     as a result of the findings and conclusions set out above, the deeds referenced above and admitted in evidence as Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9 conveyed to Plaintiffs ten percent (10%) of the oil, gas, and other minerals in and to the Property described in Exhibit A to this Judgment that the Defendants owned as of September 7, 2001.

IT IS THEREFORE ORDERED that the Plaintiffs recover from the Defendants title to and possession of an undivided five percent (5%) interest in and to the oil, gas, and other minerals in and under the property described in Exhibit A to this Judgment, and have a writ of possession.

IT IS FURTHER ORDERED that the Defendants recover from the Plaintiffs title to and possession of an undivided forty-five percent (45%) interest in and to the oil, gas, and other minerals in and under the property described in Exhibit A to this Judgment, and have a writ of possession.

All costs of court spent or incurred in this cause are adjudged against the party incurring same.

All writs and processes for the enforcement and collection of this Judgment may issue as necessary.

All relief requested in this cause and not expressly granted is denied. This judgment finally disposes of all parties and claims and is appealable.

SIGNED ON _____3 | 9_____, 2015.


                                              The Honorable Craig M. Mixson
                                              District Judge Presiding

## EXHIBIT A: PROPERTY DESCRIPTION

BEING a survey of 126.632 acres of land and being all of a called
115-1/2 acre tract recorded in Vol. 105, Page No. 20, Deed Records
of San Augustine County, Texas, and being a part of the J. S.
COLLINS PRE-EMPTION SURVEY, A-445, and being located approximately
15 miles SW of the courthouse in San Augustine, Texas, and being
more particularly described by metes and bounds, to-wit:

BEGINNING: At the NW corner of said 115-1/2 acre tract being the NE
corner of a 72.00 acre tract now owned by W. L. Brown recorded in
Vol. 133, Page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of
said J. S. Collins Survey from which a 13" Sweetgum found marked
"X" brs. N. 11 1/4' W, 10.6 feet and a 9" Pine found marked "X"
brs. N 38-1/4' E, 18.7 feet and a 10" Sweetgum found marked "X"
brs. S 43 E, 24.00 feet;

THENCE: N 59° 09' 25" E, along the NBL of said 115-1/2 acre tract
and the SBL of a tract now owned by Kirby Lumber Co. and a well
marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which
a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet;

THENCE: N 73° 43' 08" E, along a well marked line to a Pine knot
found set for corner, a distance of 59.57 feet from which a 12"
Sweetgum found marked "X" brs. S 81 W, 11.3 feet;

THENCE: N 68° 31' 17" E, along said well marked line to a Pine knot
found set for corner, a distance of 161.11 feet from which a 24"
Post Oak found marked "X" brs. N. 69-1/4' E, 22.5 feet;

THENCE: N 72° 18' 18" E, along said well marked line, to a Pine
knot found set for corner, a distance of 110.1 feet from which a
14" Post Oak found marked "X" brs. S 81-1/4' W, 15.5 feet;

THENCE: N 65° 59' 25" E, along said well marked line, 177.64 feet
a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X"
brs. N 32-3/4' E, 5.7 feet and a 16" Pine found marked "X" brs. N
62-1/4' W, 16.00 feet;

THENCE: S 88° 05' 47" E, along said well marked line to a Pine knot
found set for corner, a distance of 273.35 feet from which a 14"
Blackgum found marked "X" brs. N 58-1/2' W, 15.2 feet;

THENCE: S 49° 38' 48" E, along said well marked line to a Pine knot
found set for corner, a distance of 194.30 feet a 14" Sweet Bay
found marked "X" brs. S 25 E, 25.7 feet;

THENCE: S 8° 06' 20" E, along said well marked line to a Pine knot
found set for corner, a distance of 363.00 feet from which a 36"
Pen Oak found marked "X" brs. N 33-1/2' W, 1.5 feet and a 18" Pen

Oak found marked "X" brs. S 46 E, 18.3 feet;

THENCE: S 19° 29' 42" E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S. 79-1/2' W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7';

THENCE: S 18° 30' 35" W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74-1/2' E, 4.6 feet;

THENCE: S 30° 55' 58" E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22-1/4' W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet;

THENCE: S 30° 11' 35" W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet;

THENCE: S 2° 09' 56" E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet;

THENCE: S 9° 14' 18" E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46-1/2' E, 5.5 feet and a 12" Pen Oak found marked "X" brs. 45-1/2' W, 5.9 feet;

THENCE: S 55° 52' 00" E, along said well marked line, 122.59 feet;

THENCE: S 39° 57' 49" E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet;

THENCE: S 3° 51' 54" W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet;

THENCE: S 31° 52' 54" E, along said well marked line to the SE corner of said 115-1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58-1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet;

THENCE: S 59° 12' 38" W, along the SBL of said 115-1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115-1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet;

THENCE: N 47° 58' 00" W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81-1/2' E, 84.6 feet;

THENCE: N 11° 37' W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the PLACE OF BEGINNING, containing 126.632 acres of land.

**TAB 2**
**(Trial Court's Findings of Fact and Conclusions of Law)**

Cause No. CV-13-9488

| | | |
|---|---|---|
| WALTER BOUNDS and wife, | § | IN THE DISTRICT COURT |
| CAROLYN B. BOUNDS, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JOHN THOMAS PRUD'HOMME, | § | |
| JOSEPH GILBERT PRUD'HOMME, | § | SAN AUGUSTINE COUNTY, |
| JOSEPH LYNN PRUD'HOMME, | § | TEXAS |
| PETER A. BREEN, Individually and as | § | |
| Successor Trustee of the BREEN FAMILY | § | |
| TRUST, JANET M. SUTRO, SUSAN E. | § | |
| BREEN, and TERRANCE E. BREEN, | § | |
| Individually and d/b/a E.G. AND M.A. | § | |
| PRUD'HOMME BENEFICIARIES | § | |
| PARTNERSHIP, | § | |
| Defendants. | § | 1st JUDICIAL DISTRICT |

FILED
AT 1:15 O'CLOCK PM
5-8 20 15
JEAN STEPTOE District Clerk
SAN AUGUSTINE, TEXAS
BY _____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On February 25, 2015, this cause came on for trial before the Court without a jury.

Walter Bounds and wife, Carolyn Bounds, Plaintiffs, appeared in person and by attorney of record and announced ready for trial, and John Thomas Prud'homme, Joseph Gilbert Prud'homme, Joseph Lynn Prud'homme, Peter A. Breen, Individually and as Successor Trustee of the Breen Family Trust, Janet M. Sutro, Susan E. Breen, and Terrance E. Breen, Individually and d/b/a/ E.G. and M.A. Prud'homme Beneficiaries Partnership, Defendants, appeared in person and by attorney of record and announced ready for trial. After considering the pleadings, the evidence, the argument and briefs from counsel, the Court, in response to a request from Plaintiffs, makes its findings of fact and conclusions of law as follows:

-X-

## FINDINGS OF FACT

1.  Immediately prior to May 22, 1971, E.G. Prud'homme, Sr. and wife, Mary Anderson Prud'homme, owned 100% of the surface estate, and an undivided 50% of the mineral estate, with respect to the 126.632 acres of land in San Augustine County, Texas, described in more detail in Exhibit A to the Judgment in this case and to these Findings of Fact and Conclusions of Law.

2.  The property described in the attached Exhibit A will hereafter be referred to as the "126 acres."

3.  By way of a Deed dated May 22, 1971, E.G. Prud'homme, Sr. and wife, Mary Anderson Prud'homme, conveyed 100% of their surface interest and 50% of their mineral interest in the 126 acres to Eck G. Prud'homme, Jr., Eleanor Prud'homme Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme DBA the E.G. and M.A. Prud'homme Beneficiaries Partnership.

4.  By way of the 1971 Deed described in FF 3, E.G. Prud'homme, Sr. and Mary Anderson Prud'homme reserved to themselves one half of the minerals they owned in and under the 126 acres.

5.  The 1971 deed described in FF 3 was admitted in evidence at trial as Plaintiffs' Exhibit 3.

6.  E.G. Prud'homme, Sr. died in 1981.

7.  When E.G. Prud'homme, Sr. died, his interest in the minerals reserved from the 1971 conveyance of the 126 acres to the E.G. and M.A. Prud'homme Beneficiaries Partnership passed one-half to Mary Anderson Prud'homme, and one-half to the Trustees of the E.G. and M.A. Prud'homme Trust Fund.

-XI-

8. Mary Anderson Prud'homme died on May 5, 1988.

9. When Mary Anderson Prud'homme died, her interest in the minerals reserved from the 1971 conveyance of the 126 acres to the E.G. and M.A. Prud'homme Beneficiaries Partnership passed to the Trustees of the E.G. and M.A. Prud'homme Trust Fund.

10. The E.G. and M.A. Prud'homme Trust Fund was established by a Trust Agreement dated October 14, 1966.

11. The E.G. and M.A. Prud'homme Beneficiaries Partnership is a Texas General Mercantile Partnership created as of the last day of January, 1971.

12. On or about July 4, 2001, The E.G. and M.A. Prud'homme Beneficiaries Partnership entered into a contract to sell its interest in the 126 acres to Walter and Carolyn Bounds.

13. Walter and Carolyn Bounds were represented by counsel, Mr. John Griffin, with respect to their purchase of the 126 acres from the E.G. and M.A. Prud'homme Beneficiaries Partnership.

14. John Griffin prepared a Warranty Deed, dated September 7, 2001, by and between Eck. G. Prud'homme, Jr., Al Joseph Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, d/b/a E.G. and M.A. Prud'homme Beneficiaries Partnership, as Grantors, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees.

15. The Warranty Deed dated September 7, 2001, by and between Eck. G. Prud'homme, Jr., Al Joseph Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, d/b/a E.G. and M.A. Prud'homme

-XII-

Beneficiaries Partnership, as Grantors, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees was admitted in evidence as Plaintiff's Exhibit 5.

16. The Warranty Deed dated September 7, 2001, by and between Eck. G. Prud'homme, Jr., Al Joseph Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, d/b/a E.G. and M.A. Prud'homme Beneficiaries Partnership, as Grantors, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, was executed by its Grantors on September 8, 2001 and on September 12, 2001.

17. The Warranty Deed dated September 7, 2001, by and between Eck. G. Prud'homme, Jr., Al Joseph Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, d/b/a E.G. and M.A. Prud'homme Beneficiaries Partnership, as Grantors, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees was recorded in the Records of San Augustine County, Texas in Volume 24, Page 20.

18. Gilbert Prud'homme has at all times served as the Managing Partner of the E.G. and M.A. Prud'homme Beneficiaries Partnership.

19. At the time Gilbert Prud'homme executed the Warranty Deed dated September 7, 2001, by and between Eck. G. Prud'homme, Jr., Al Joseph Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, d/b/a E.G. and M.A. Prud'homme Beneficiaries Partnership, as Grantors, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, he understood that it reserved the minerals in and under the 126 acres to its grantors.

20. John Griffin prepared a warranty deed dated September 7, 2001, by and between Hal Joseph Breen, a single person, Individually and as Trustee of the Breen

-XIII-

Family Trust and Personal Representative under the Last Will of Eleanor P. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees.

21. Hal Joseph Breen executed the Warranty Deed dated September 7, 2001, by and between Hal Joseph Breen, a single person, Individually and as Trustee of the Breen Family Trust and Personal Representative under the Last Will of Eleanor P. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees on October 9, 2001.

22. The Warranty Deed dated September 7, 2001, by and between Hal Joseph Breen, a single person, Individually and as Trustee of the Breen Family Trust and Personal Representative under the Last Will of Eleanor P. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, was recorded in the Records of San Augustine County, Texas in Volume 24, Page 25, and admitted in evidence as Plaintiffs' Exhibit 6.

23. John Griffin prepared the Warranty Deed dated September 7, 2001, by and between Peter A. Breen, Individually and as Successor Trustee of the Breen Family Trust, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees.

24. Peter A. Breen executed the Warranty Deed dated September 7, 2001, by and between Peter A. Breen, Individually and as Successor Trustee of the Breen Family Trust, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees on October 9, 2001.

25. The Warranty Deed dated September 7, 2001, by and between Peter A. Breen, Individually and as Successor Trustee of the Breen Family Trust, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, was recorded in the Records of San Augustine County, Texas in Volume 24, Page 28, and admitted in evidence as Plaintiffs' Exhibit 7.

-XIV-

26. John Griffin prepared the Warranty Deed dated September 7, 2001, by and between Susan E. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees.

27. Susan E. Breen executed the Warranty Deed dated September 7, 2001, by and between Susan E. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees on October 5, 2001.

28. The Warranty Deed dated September 7, 2001, by and between Susan E. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, was recorded in the Records of San Augustine County, Texas in Volume 24, Page 31, and admitted in evidence as Plaintiffs' Exhibit 8.

29. John Griffin prepared the Warranty Deed dated September 7, 2001, by and between Terence J. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees.

30. Terence J. Breen executed the Warranty Deed dated September 7, 2001, by and between Terence J. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees on October 17, 2001.

31. The Warranty Deed dated September 7, 2001, by and between Terence J. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, was recorded in the Records of San Augustine County, Texas in Volume 24, Page 34, and admitted in evidence as Plaintiffs' Exhibit 8A.

32. John Griffin prepared the Warranty Deed dated September 7, 2001, by and between Janet M. Breen Sutro, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees.

-XV-

33. Janet M. Breen Sutro executed the Warranty Deed dated September 7, 2001, by and between Janet M. Breen Sutro, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees on October 9, 2001.

34. The Warranty Deed dated September 7, 2001, by and between Janet M. Breen Sutro, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 37, and admitted in evidence as Plaintiffs' Exhibit 9.

35. On November 5, 2001, a title insurance policy was issued, in favor of Walter and Carolyn Bounds, with respect to the 126 acres.

36. The title insurance policy, described in FF 35, above, references "Mineral Reservation as set forth in multiple Warranty Deeds from Eck G. Prud'homme, et al, to Walter Bounds and wife, Carolyn Bounds, all dated September 7, 2001, and recorded in the Real Property Records of San Augustine County, Texas, as follows: Vol. 24, Page 20; Vol. 24, Page 25; Vol. 24, Page 28; Vol. 24, Page 31; Vol. 24, Page 34; and Vol. 24, Page 37."

37. The title insurance policy, described in FF 35, above, was provided to Plaintiffs and their lawyer at or near the time of its issuance in November, 2001.

38. Plaintiff Walter Bounds, who owns and operates an insurance agency, reviewed the title insurance policy, described in FF 35, above, at the time it was issued.

39. Effective April 29, 2008, Elite Landworks Association entered into a series of oil and gas leases for the 126 acres with the various Prud'homme/Breen parties who had been the grantors of the 2001 deeds described above and admitted in evidence as Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9.

-XVI-

40. By various assignments, XTO Energy acquired Elite Landworks Association's leasehold interest in the 126 acres.

41. The 2001 deeds executed in October, 2001 (i.e. Plaintiffs' Exhibits 6, 7, 8, 8A, and 9) contain a sentence in the property description not found in the first deed (Plaintiffs' Exhibit 5), executed in September 2001: "This deed is intended to convey all of · Grantor's interest in and to the above-described real property."

42. The parties intended that these October-executed deeds (Plaintiffs' Exhibits 6, 7, 8, 8A, and 9) should not reserve the minerals to their grantors.

43. Plaintiffs Walter and Carolyn Bounds believed that, when they acquired the 126 acres from the Defendants in 2001, they were acquiring whatever mineral interest the Defendants owned with respect to the 126 acres.

44. Defendants believed that, when they conveyed the 126 acres to the Plaintiffs in 2001, they were reserving whatever mineral interest the Defendants owned with respect to the 126 acres.

45. Plaintiffs and Defendants did not have identical intent and understanding of the terms to be embodied in the 2001 deeds (Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9) at the time those deeds were executed.

46. Plaintiffs Walter and Carolyn Bounds did not exercise reasonable diligence with respect to their review of the 2001 deeds (Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9) by which they acquired their interest in the 126 acres.

47. To the extent Plaintiffs believed that the 2001 deeds (Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9) should have conveyed the minerals to the Plaintiffs, they were on notice

-XVII-

that the 2001 deeds (Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9) did not do so, or were ambiguous, at the time the deeds were executed.

48. To the extent Plaintiffs believed that the 2001 deeds (Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9) should have conveyed the minerals to the Plaintiffs, they were on notice that the 2001 deeds (Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9) did not do so, or were ambiguous, no later than early November, 2001, when they received the title insurance policy.

49. Plaintiffs filed this lawsuit on October 8, 2013.

## CONCLUSIONS OF LAW

1. The Warranty Deed dated September 7, 2001, by and between Eck. G. Prud'homme, Jr., Al Joseph Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, d/b/a E.G. and M.A. Prud'homme Beneficiaries Partnership, as Grantors, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 20, and admitted in evidence as Plaintiffs' Exhibit 5, is not ambiguous.

2. The Warranty Deed dated September 7, 2001, by and between Eck. G. Prud'homme, Jr., Al Joseph Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, d/b/a E.G. and M.A. Prud'homme Beneficiaries Partnership, as Grantors, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 20, and admitted in evidence as Plaintiffs' Exhibit 5, is construed to reserve to its Grantors any and all oil, gas, and other minerals owned by its Grantors with respect to the property conveyed by the deed.

-XVIII-

3.     Plaintiffs' cause of action for reformation is barred by the statute of limitations, as it was not brought within four years of the date it accrued.

4.     As a matter of law, Plaintiffs' cause of action for reformation accrued at the time the 2001 deeds (Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9) were executed, as the deeds were duly recorded and in Plaintiff's chain of title.

5.     Plaintiffs' cause of action for reformation could have accrued no later than early November, 2001, as at that time Plaintiffs knew, or in the exercise of reasonable diligence should have known, that the deeds did not convey the minerals to them, or were ambiguous.

6.     Even if Plaintiffs' cause of action for reformation was not barred by limitations, Plaintiffs would still not be entitled to reformation, as they did not prove by clear, exact, and satisfactory evidence that that deeds' inclusion of language of mineral reservation was the result of a mutual mistake.

7.     The Warranty Deed dated September 7, 2001, by and between Hal Joseph Breen, a single person, Individually and as Trustee of the Breen Family Trust and Personal Representative under the Last Will of Eleanor P. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 25, and admitted in evidence as Plaintiffs' Exhibit 6, is ambiguous, and is construed to convey to its Grantees any and all oil, gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed.

8.     The Warranty Deed dated September 7, 2001, by and between Peter A. Breen, Individually and as Successor Trustee of the Breen Family Trust, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San

-XIX-

Augustine County, Texas in Volume 24, Page 28, and admitted in evidence as Plaintiffs' Exhibit 7, is ambiguous, and is hereby construed to convey to its Grantees any and all oil, gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed.

9. The Warranty Deed dated September 7, 2001, by and between Susan E. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 31, and admitted in evidence as Plaintiffs' Exhibit 8, is ambiguous, and is construed to convey to its Grantees any and all oil, gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed.

10. The Warranty Deed dated September 7, 2001, by and between Terence J. Breen, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 34, and admitted in evidence as Plaintiffs' Exhibit 8A, is ambiguous, and is construed to convey to its Grantees any and all oil, gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed.

11. the Warranty Deed dated September 7, 2001, by and between Janet M. Breen Sutro, as Grantor, and Walter Bounds and wife, Carolyn B. Bounds, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 24, Page 37, and admitted in evidence as Plaintiffs' Exhibit 9, is ambiguous, and is construed to convey to its Grantees any and all oil, gas, and other minerals owned by its Grantor with respect to the property conveyed by the deed.

-XX-

12. For purposes of this cause, the Deed dated May 22, 1971, by and between E.G. Prud'homme, Sr. and wife, Mary Anderson Young Prud'homme, as Grantors, and Eck. G. Prud'homme, Jr., Eleanor Prud'homme Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme DBA the E.G. and M.A. Prud'homme Beneficiaries Partnership, as Grantees, recorded in the Records of San Augustine County, Texas in Volume 166, Page 239, and admitted in evidence as Plaintiffs' Exhibit 3, is the common source of title for the 126 acres. At the time of this Deed, E.G. Prud'homme, Sr. and wife, Mary Anderson Young Prud'homme owned an undivided fifty percent (50%) interest in the oil, gas, and other minerals in and to the 126 acres.

13. As a result of the findings and conclusions set out above, the deeds referenced above and admitted in evidence as Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9 conveyed to Plaintiffs ten percent (10%) of the oil, gas, and other minerals in and to the 126 acres that the Defendants owned as of September 7, 2001.

14. Since the Defendants owned 50% of the oil, gas, and other minerals in and to the 126 acres as of September 7, 2001, as a result of the deeds referenced above and admitted in evidence as Plaintiffs' Exhibits 5, 6, 7, 8, 8A, and 9, Plaintiffs acquired an undivided five percent (5%) interest in the oil, gas, and other minerals in and to the 126 acres, and Defendants reserved an undivided forty-five percent (45%) interest in the oil, gas, and other minerals in and to the 126 acres.

SIGNED ON _____ 5/6 _____, 2015.

The Honorable Craig M. Mixson
District Judge Presiding

-XX-

## EXHIBIT A: PROPERTY DESCRIPTION

BEING a survey of 126.632 acres of land and being all of a called 115-1/2 acre tract recorded in Vol. 105, Page No. 20, Deed Records of San Augustine County, Texas, and being a part of the J. S. COLLINS PRE-EMPTION SURVEY, A-445, and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to-wit:

BEGINNING: At the NW corner of said 115-1/2 acre tract being the NE corner of a 72.00 acre tract now owned by W. L. Brown recorded in Vol. 133, Page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N. 11 1/4' W, 10.6 feet and a 9" Pine found marked "X" brs. N 38-1/4' E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet;

THENCE: N 59° 09' 25" E, along the NBL of said 115-1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet;

THENCE: N 73° 43' 08" E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet;

THENCE: N 68° 31' 17" E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69-1/4' E, 22.5 feet;

THENCE: N 72° 18' 18" E, along said well marked line, to a Pine knot found set for corner, a distance of 110.1 feet from which a 14" Post Oak found marked "X" brs. S 81-1/4' W, 15.5 feet;

THENCE: N 65° 59' 25" E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32-3/4' E, 5.7 feet and a 16" Pine found marked "X" brs. N 62-1/4' W, 16.00 feet;

THENCE: S 88° 05' 47" E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58-1/2' W, 15.2 feet;

THENCE: S 49° 38' 48" E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet;

THENCE: S 8° 06' 20" E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36" Pen Oak found marked "X" brs. N 33-1/2' W, 1.5 feet and a 18" Pen

-XXII-

Oak found marked "X" brs. S 46 E, 18.3 feet;

THENCE: S 19° 29' 42" E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S. 79-1/2' W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7';

THENCE: S 18° 30' 35" W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74-1/2' E, 4.6 feet;

THENCE: S 30° 55' 58" E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22-1/4' W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet;

THENCE: S 30° 11' 35" W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet;

THENCE: S 2° 09' 56" E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet;

THENCE: S 9° 14' 18" E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46-1/2' E, 5.5 feet and a 12" Pen Oak found marked "X" brs. 45-1/2' W, 5.9 feet;

THENCE: S 55° 52' 00" E, along said well marked line, 122.59 feet;

THENCE: S 39° 57' 49" E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet;

THENCE: S 3° 51' 54" W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet;

THENCE: S 31° 52' 54" E, along said well marked line to the SE corner of said 115-1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58-1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet;

THENCE: S 59° 12' 38" W, along the SBL of said 115-1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115-1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet;

THENCE: N 47° 58' 00" W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81-1/2' E, 84.6 feet;

THENCE: N 11° 37' W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the PLACE OF BEGINNING, containing 126.632 acres of land.

**TAB 3**
**(Farm and Ranch Contract)**

PROMULGATED BY THE TEXAS REAL ESTATE COMMISSION (TREC)

## FARM AND RANCH CONTRACT

1. **PARTIES:** E. G. and M. A. Prud'homme Beneficiaries Partnership _____ (Seller) agrees to sell and convey to Walter and Carolyn Bounds _____ (Buyer) and Buyer agrees to buy from Seller the property described below.

2. **PROPERTY:** The land situated in San Augustine _____ County, Texas, described as follows:

Called 126.625 Acres in the J. S. Collins Survey, Abstract 445 and the H. H. Hall Survey, Abstract 404

More fully described in a warranty deed from E.G. Prud'homme, Sr. etal to Eck G. Prud'homme, Jr. on 8/3/71, Vol. 166, Page 239, Tract #6, Deed Records San Augustine County, Texas. (Attachment A)

or as described on attached exhibit, together with all improvements thereon and all rights, privileges and appurtenances pertaining thereto, including but not limited to: water rights, claims and permits, easements, all rights and obligations of applicable government programs and cooperative or association memberships. Included with the sale are the following items, if any: windmills and tanks, domestic water systems, curtains and rods, draperies and rods, valances, blinds, window shades, screens, shutters, awnings, wall-to-wall carpeting, mirrors fixed in place, ceiling fans, attic fans, mail boxes, television antennas and satellite dish with controls and equipment, permanently installed heating and air conditioning units, window air conditioning units, built-in security and fire detection equipment, plumbing and lighting fixtures, including chandeliers, water softener, stove, built-in kitchen equipment, garage door openers with controls, built-in cleaning equipment, all swimming pool equipment and maintenance accessories, shrubbery, landscaping, permanently installed outdoor cooking equipment, built-in fireplace screens, artificial fireplace logs and all other property owned by Seller and attached to the above described real property.

The following crops and equipment are included: _____

The following property is not included: _____

All property sold by this contract is called the "Property." The Property will be conveyed subject to the following exceptions, reservations, conditions and restrictions (if none, insert "none"):

A. Minerals, Royalties, and Timber interests:   All minerals owned to be conveyed

   (1) Presently outstanding in third parties:

   (2) To be additionally retained by Seller:

B. Mineral Leases:

C. Surface Leases:

D. Easements:

PLAINTIFF'S EXHIBIT

tabbies

21

2-25-15

Initialed for Identification by Buyer _____ and Seller _____          **01A**          TREC NO.25-3

Farm and Ranch Contract                                                    Page Two   11-08-99

E. Restrictions, Zoning Ordinances or other Exceptions:

**3. SALES PRICE:**
A. Cash portion of Sales Price payable by Buyer at closing ..................... $101,300.00
B. (1) Sum of all financing described in Paragraph 4 ................ $_____
   (2) Less: face amount of any lender required stock ............... <_____>
   (3) Difference between B(1) and B(2) ........................ ....... $_____
C. Sales Price [sum of A and B(3)] .................................... $101,300.00
D. The Sales Price ☐ will ☐ will not be adjusted based on the survey required by Paragraph 6B, and the number of acres over or under _____ acres will be multiplied by $_____ per acre. The result thereof will be added to or subtracted from the Sales Price, and the cash amount set out in 3A will be adjusted accordingly; however, if the amount set out in 3A is to be adjusted by more than 10%, either party may terminate this contract and the earnest money will be refunded to Buyer.

**4. FINANCING:** Within _____ days after the effective date of this contract Buyer shall apply for all third party financing or noteholder's approval of any assumption and make every reasonable effort to obtain financing or assumption approval. Financing or assumption approval will be deemed to have been obtained when the lender determines that Buyer has satisfied all of lender's financial requirements (those items relating to Buyer's net worth, income and creditworthiness). If financing (including the face amount of any lender required stock) or assumption approval is not obtained within_____ days after the effective date hereof, this contract will terminate and the earnest money will be refunded to Buyer. Each note to be executed hereunder must be secured by vendor's and deed of trust liens.

The portion of Sales Price not payable in cash will be paid as follows: (Check applicable boxes below)

☐ A. THIRD PARTY FINANCING:
   ☐ (1) This contract is subject to approval for Buyer of a third party first lien note of $_____ (including the face amount of any lender required stock) payable at _____ intervals for not less than _____ years with the initial interest rate not to exceed _____ % per annum.
   ☐ (2) This contract is subject to approval for Buyer of a third party second lien note of $_____ (including the face amount of any lender required stock) payable at _____ intervals for not less than _____ years with the initial interest rate not to exceed _____ % per annum.

☐ B. SELLER FINANCING: A promissory note from Buyer to Seller of $_____, bearing _____% interest per annum, secured by vendor's and deed of trust liens, in accordance with the terms and conditions set forth in the attached TREC Seller Financing Addendum. If an owner policy of title insurance is furnished, Buyer shall furnish Seller with a mortgagee policy of title insurance.

☐ C. ASSUMPTION:
   ☐ (1) Buyer shall assume the unpaid principal balance of a first lien promissory note payable to _____ dated _____, which unpaid balance at closing will be $_____ (including the face amount of any lender required stock). The total current monthly payment including principal, interest and any reserve deposits is $_____. Buyer's initial payment will be the first payment due after closing.
   ☐ (2) Buyer shall assume the unpaid principal balance of a second lien promissory note payable to _____ dated _____, which unpaid balance at closing will be $_____ (including the face amount of any lender required stock). The total current monthly payment including principal, interest and any reserve deposits is $_____. Buyer's initial payment will be the first payment due after closing.

If any assumed loan initially required the purchase of lender's stock, the sale of the Property will include such stock.

Buyer's assumption of an existing note includes all obligations imposed by the deed of trust securing the note. If the unpaid principal balance(s) of any assumed loan(s) as of the Closing Date varies from the loan balance(s) stated above, the ☐ cash payable at closing ☐ Sales Price will be adjusted by the amount of any variance; provided, if the total principal balance of all assumed loans varies in an amount greater than $500.00 at closing, either party may terminate this contract and the earnest money will

Initialed for identification by Buyer_____ and Seller_____      **01A**       TREC NO.25-3

**Farm and Ranch Contract**                                              Page Three  11-08-99

be refunded to Buyer unless the other party elects to eliminate the excess in the variance by an appropriate adjustment at closing. If the noteholder on assumption requires (a) Buyer to pay an assumption fee in excess of $_____ in C(I) above or $_____ in C(2) above, and Seller declines to pay such excess or (b) an increase in the interest rate to more than _____% in C(I) above or _____% in C(2) above, or (c) any other modification of the loan documents, Buyer may terminate this contract and the earnest money will be refunded to Buyer. A vendor's lien and deed of trust to secure assumption will be required, which will automatically be released on execution and delivery of a release by noteholder. If Seller is released from liability on any assumed note, the vendor's lien and deed of trust to secure assumption will not be required.

**NOTICE TO BUYER:** The payments, interest rates or other terms of some loans may be adjusted by the lender at or after closing. If you are concerned about the possibility of future adjustments, do not sign the contract without examining the notes and deeds of trust.

**NOTICE TO SELLER:** Your liability to pay the note assumed by Buyer will continue unless you obtain a release of liability from the lender. If you are concerned about future liability, you should use the TREC Release of Liability Addendum.

☐ D. **CREDIT APPROVAL ON ASSUMPTION OR SELLER FINANCING:** Within _____ days after the effective date of this contract, Buyer shall deliver to Seller ☐ credit report ☐ verification of employment, including salary ☐ verification of funds on deposit in financial institutions ☐ current financial statement to establish Buyer's creditworthiness for assumption approval or seller financing and ☐ _____

If Buyer's documentation is not delivered within the specified time, Seller may terminate this contract by notice to Buyer within 7 days after expiration of the time for delivery, and the earnest money will be paid to Seller. If this contract is not so terminated, Seller will be deemed to have accepted Buyer's credit. If the documentation is timely delivered, and Seller determines in Seller's sole discretion that Buyer's credit is unacceptable, Seller may terminate this contract by notice to Buyer within 7 days after expiration of the time for delivery and the earnest money will be refunded to Buyer. If Seller does not so terminate this contract, Seller will be deemed to have accepted Buyer's credit. Buyer hereby authorizes any credit reporting agency to furnish to Seller at Buyer's sole expense copies of Buyer's credit reports.

5. **EARNEST MONEY:** Buyer shall deposit $ 1,000.00 _____ as earnest money with Griffin Law Offices at 131 Tenaha St., Center, Tx 75935

(Address), as escrow agent, upon execution of this contract by both parties. Additional earnest money of $_____ must be deposited by Buyer with escrow agent on or before _____, _____. If Buyer fails to deposit the earnest money as required by this contract, Buyer will be in default.

6. **TITLE POLICY AND SURVEY:**

☒ A. **TITLE POLICY:** Seller shall furnish to Buyer at ☒ Seller's ☐ Buyer's expense an owner policy of title insurance (the Title Policy) issued by _____(the Title Company) in the amount of the Sales Price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy, subject to the promulgated exclusions (including existing building and zoning ordinances) and the following exceptions:

(1) The standard printed exception for standby fees, taxes and assessments.
(2) Liens created as part of the financing described in Paragraph 4.
(3) Those matters specifically described in Paragraph 2.
(4) The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements.
(5) The standard printed exception as to marital rights.
(6) The standard printed exception as to waters, tidelands, beaches, streams, and related matters.

Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to Buyer a commitment for title insurance (the Commitment) and, at Buyer's expense, legible copies of restrictive covenants and documents evidencing exceptions in the Commitment other than the standard printed exceptions. *Seller authorizes the Title Company to mail or hand deliver the Commitment and related documents to Buyer at Buyer's address shown below.* If the Commitment is not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days.

☐ B. **SURVEY:** (Check one box only)

☐ (1) Within _____ days after the effective date of this contract, Buyer shall obtain a survey at Buyer's expense.

Initialed for Identification by Buyer _____ and Seller _____      **01A**      TREC NO. 25-3

-XXVII-

☐ (2) Within _____ days after the effective date of this contract, Seller shall cause a survey to be delivered to Buyer at Seller's expense.

☐ (3) Within _____ days after the effective date of this contract, Seller will deliver to Buyer the existing survey plat of the Property dated _____. _____ which ☐ will ☐ will not be recertified to a date subsequent to the effective date of this contract at the expense of ☐ Buyer ☐ Seller.

The survey must be made by a Registered Professional Land Surveyor acceptable to the Title Company and any lender.

Buyer will have 7 days after the receipt of the latter of the Commitment or survey to object in writing to matters disclosed in the Commitment or survey except for those matters specifically described in Paragraph 2. Buyer's failure to object under Paragraph 6 within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment will not be deemed to have been waived. Seller shall cure the timely objections of Buyer or any third party lender within 20 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured by the extended Closing Date, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer elects to waive the objections.

☐ C. ABSTRACT OF TITLE: TREC Addendum for Abstract of Title, or an addendum required by the parties, is attached.

**NOTICE TO SELLER AND BUYER:**

(1) Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

(2) If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49 of the Texas Water Code requires Seller to deliver and the Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(3) Eligibility for government farm program benefits may depend upon compliance with a soil conservation plan for the Property. Buyer is advised to determine whether the property is subject to and in compliance with a plan before signing this contract.

(4) Buyer is advised that the presence of wetlands, toxic substances, including asbestos and wastes or other environmental hazards or the presence of a threatened or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum either promulgated by TREC or required by the parties should be used.

(5) If the Property is located outside the limits of a municipality, Seller notifies Buyer under §5.011, Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

(6) If the Property abuts the tidally influenced submerged lands of the state, Section 33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract. An addendum either promulgated by TREC or required by the parties should be used.

(7) Unless expressly prohibited in writing by the parties, Seller may continue to show the Property for sale and to receive, negotiate and accept back-up offers.

(8) Any residential service contract that is purchased in connection with this transaction should be reviewed for the scope of coverage, exclusions and limitations. **The purchase of a residential service contract is optional. Similar coverage may be purchased from various companies authorized to do business in Texas.**

7. **PROPERTY CONDITION:**

   A. INSPECTIONS, ACCESS AND UTILITIES: Buyer may have the Property inspected by an inspector selected by Buyer, licenced by TREC or otherwise permitted by law to make such inspections. Seller shall permit access to the Property at reasonable times for inspection, repairs and treatment and for

Initialed for identification by Buyer _____ and Seller _____          **01A**          TREC NO.25-3

reinspection after repairs and treatment have been completed. Seller shall pay for turning on utilities for inspection and reinspection.

B. **SELLER'S DISCLOSURE NOTICE PURSUANT TO SECTION 5.008, TEXAS PROPERTY CODE** (Notice) (check one box only):
- ☐ (1) Buyer has received the Notice.
- ☐ (2) Buyer has not received the Notice. Within _____ days after the effective date of this contract, Seller shall deliver the Notice to Buyer. If Buyer does not receive the Notice, Buyer may terminate this contract at any time prior to the closing. If Seller delivers the Notice, Buyer may terminate this contract for any reason within 7 days after Buyer receives the Notice or prior to the closing, whichever first occurs.
- ☐ (3) The Texas Property Code does not require this Seller to furnish the Notice.

C. **SELLER'S DISCLOSURE OF LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS** is required by Federal law for a residential dwelling constructed prior to 1978. An addendum providing such disclosure ☐ is ☐ is not attached.

D. **ACCEPTANCE OF PROPERTY CONDITION:** (check one box only):
- ☐ (1) In addition to any earnest money deposited with escrow agent, Buyer has paid Seller $_____ (the "Option Fee") for the (i) right to inspect the Property at Buyer's cost, (ii) right to conduct feasibility studies as Buyer deems necessary and (iii) unrestricted right to terminate this contract by giving notice of termination to Seller within _____ days after the effective date of this contract. If Buyer gives notice of termination within the time specified, the Option Fee will not be refunded, however, any earnest money will be refunded to Buyer. If Buyer does not give notice of termination within the time specified, Buyer will be deemed to have accepted the Property in its current condition and the Option Fee ☐ will ☐ will not be credited to the Sales Price at closing.
- ☐ (2) Buyer accepts the Property in its present condition; provided Seller, at Seller's expense, shall complete the following repairs and treatment: _____
_____

E. **LENDER REQUIRED REPAIRS AND TREATMENTS (REPAIRS):** Unless otherwise agreed in writing, neither party is obligated to pay for lender required repairs or treatments for wood destroying insects. If the cost of lender required repairs exceeds 5% of the Sales Price, Buyer may terminate this contract.

F. **COMPLETION OF REPAIRS AND TREATMENT.** Unless otherwise agreed by the parties in writing, Seller shall complete all agreed repairs and treatment prior to the Closing Date. Repairs and treatments must be performed by persons who regularly provide such repairs or treatments. At Buyer's election, any transferable warranties received by Seller with respect to the repairs will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed repairs and treatment prior to the Closing Date, Buyer may do so and the Closing Date will be extended up to 15 days, if necessary, to complete repairs and treatment.

8. **BROKERS' FEES:** All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

9. **CLOSING:** The closing of the sale will be on or before _September 2, 2001_____, or within 7 days after objections to matters disclosed in the Commitment or by the survey have been cured, whichever date is later (the Closing Date). *If financing or assumption approval has been obtained pursuant to Paragraph 4,* the Closing Date will be extended up to 15 days if necessary to comply with lender's closing requirements (for example, appraisal, survey, insurance policies, lender-required repairs, closing documents). If either party fails to close this sale by the Closing Date, the non-defaulting party will be entitled to exercise the remedies contained in Paragraph 15. At closing Seller shall furnish tax statements or certificates showing no delinquent taxes, and a general warranty deed conveying good and indefeasible title showing no additional exceptions to those permitted in Paragraph 6.

10. **POSSESSION:** Seller shall deliver possession of the Property to Buyer on _or before September 2, 2001_ in its present or required repaired condition, ordinary wear and tear excepted. Any possession by Buyer prior to closing or by Seller after closing which is not authorized by a temporary lease form promulgated by TREC or required by the parties will establish a tenancy at sufferance relationship between the parties. *Consult your insurance agent prior to change of ownership or possession as insurance coverage may be limited or terminated. The absence of a written lease or appropriate insurance coverage may expose the parties to economic loss.*

Initialed for identification by Buyer _____ and Seller _____          **01A**          TREC NO.25-3

-XXIX-

**11. SPECIAL PROVISIONS:** (Insert only factual statements and business details applicable to this sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum, lease or other form has been promulgated by TREC for mandatory use.)

**12. SETTLEMENT AND OTHER EXPENSES:**

A. The following expenses must be paid at or prior to closing:

(1) Appraisal fees will be paid by _____

(2) The total of loan discount fees (including any Texas Veterans' Housing Assistance Program Participation Fee) may not exceed _____% of the loan of which Seller shall pay _____ and Buyer shall pay the remainder. The total of any buydown fees may not exceed _____ which will be paid by _____.

(3) Seller's Expenses: Releases of existing liens, including prepayment penalties and recording fees; release of Seller's loan liability; tax statements or certificates; preparation of deed; one-half of escrow fee; and other expenses stipulated to be paid by Seller under other provisions of this contract.

(4) Buyer's Expenses: Loan application, origination and commitment fees; loan assumption costs; preparation and recording of deed of trust to secure assumption; lender required expenses incident to new loans, including PMI premium, preparation of loan documents, recording fees, tax service and research fees, warehouse or underwriting fees, copies of restrictions and easements, amortization schedule, premiums for mortgagee title policies and endorsements required by lender, credit reports, photos; required premiums for flood and hazard insurance; required reserve deposit for insurance premiums and ad valorem taxes; interest on all monthly installment notes from date of disbursements to one month prior to dates of first monthly payments; customary Program Loan costs for Buyer; one-half of escrow fee; and other expenses stipulated to be paid by Buyer under other provisions of this contract.

B. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this contract unless the other party agrees to pay such excess. In no event will Buyer pay charges and fees expressly prohibited by the Texas Veterans' Housing Assistance Program or other governmental loan program regulations.

**13. PRORATIONS AND ROLLBACK TAXES:**

A. PRORATIONS: Taxes for the current year, interest, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. *If a loan is assumed* and the lender maintains an escrow account, the escrow account must be transferred to Buyer without any deficiency. Buyer shall reimburse Seller for the amount in the transferred account. Buyer shall pay the premium for a new insurance policy. If taxes are not paid at or prior to closing, Buyer will be obligated to pay taxes for the current year.

B. ROLLBACK TAXES: If this sale or Buyer's use of the Property after closing results in the assessment of additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Buyer. If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property claimed by Seller results in Assessments for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

**14. CASUALTY LOSS:** If any part of the Property is damaged or destroyed by fire or other casualty loss after the effective date of the contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may either (a) terminate this contract and the earnest money will be refunded to Buyer (b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c) accept the Property in its damaged condition and accept an assignment of insurance proceeds. Seller's obligations under this paragraph are independent of any obligations of Seller under Paragraph 7.

Initialed for identification by Buyer _____ and Seller _____ **01A**        TREC NO. 25-3

-XXX-

**15. DEFAULT:** If Buyer fails to comply with this contract, Buyer will be in default, and Seller may either (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. If, due to factors beyond Seller's control, Seller fails within the time allowed to make any non-casualty repairs or deliver the Commitment, Buyer may either (a) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (b) terminate this contract as the sole remedy and receive the earnest money. If Seller fails to comply with this contract for any other reason, Seller will be in default and Buyer may either (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

**16. DISPUTE RESOLUTION:** It is the policy of the State of Texas to encourage the peaceable resolution of disputes through alternative dispute resolution procedures. The parties are encouraged to use an addendum approved by TREC to submit to mediation disputes which cannot be resolved in good faith through informal discussion.

**17. ATTORNEY'S FEES:** The prevailing party in any legal proceeding brought under or with respect to the transaction described in this contract is entitled to recover from the non-prevailing party all costs of such proceeding and reasonable attorney's fees.

**18. ESCROW:** The earnest money is deposited with escrow agent with the understanding that escrow agent is not (a) a party to this contract and does not have any liability for the performance or nonperformance of any party to this contract, (b) liable for interest on the earnest money and (c) liable for any loss of earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent. At closing, the earnest money must be applied first to any cash down payment, then to Buyer's closing costs and any excess refunded to Buyer. If both parties make written demand for the earnest money, escrow agent may require payment of unpaid expenses incurred on behalf of the parties and a written release of liability of escrow agent from all parties. If one party makes written demand for the earnest money, escrow agent shall give notice of the demand by providing to the other party a copy of the demand. If escrow agent does not receive written objection to the demand from the other party within 30 days after notice to the other party, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money. Escrow agent's notice to the other party will be effective when deposited in the U. S. Mail, postage prepaid, certified mail, return receipt requested, addressed to the other party at such party's address shown below. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

**19. REPRESENTATIONS:** Seller represents that as of the Closing Date (a) there will be no liens, assessments, or security interests against the Property which will not be satisfied out of the Sales Price unless securing payment of any loans assumed by Buyer and (b) assumed loans will be without default. If any representation in this contract is untrue on the Closing Date, this contract may be terminated by Buyer and the Earnest Money will be refunded to Buyer. All representations contained in this contract will survive closing.

**20. FEDERAL TAX REQUIREMENT:** If Seller is a "foreign person", as defined by applicable law, or if Seller fails to deliver an affidavit that Seller is not a "foreign person", then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. IRS regulations require filing written reports if cash in excess of specified amounts is received in the transaction.

**21. AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are (list): _Taxes_ _for the year 2001 will be prorated to date of closing._ _____

**22. CONSULT YOUR ATTORNEY:** Real estate licensees cannot give legal advice. This is intended to be a legally binding contract. READ IT CAREFULLY. If you do not understand the effect of this contract, consult

Initialed for identification by Buyer _____ and Seller _____          **01A**          TREC NO.25-3

-XXXI-

your attorney BEFORE signing.

Buyer's
Attorney is: John Griffin

Seller's
Attorney is: _____

23. **NOTICES:** All notices from the parties to each other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile machine as follows:

To Buyer at:

Walter Bounds

431 King Street

Center, TX 75935

Telephone: (936) 5983414

Facsimile: (936)598-2181

To Seller at:

c/o Gilbert Prodhomme
1601 Rio Grande St
Austin TX

Telephone: (512) 476 0482

Facsimile: (512) 474 5562

EXECUTED the 4 day of July, 2001 (THE EFFECTIVE DATE). (BROKER: FILL IN THE DATE OF FINAL ACCEPTANCE.)

E. 2 + M.A. Prudhomme Beneficiare Partnership by Gilbert Prudhomme

Buyer _____

Buyer _____

Seller M/P

Seller _____

The form of this contract has been approved by the Texas Real Estate Commission. Such approval relates to this contract form only. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transaction. It is not suitable for complex transactions. Extensive riders or additions are not to be used. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC NO. 25-3. This form replaces TREC NO. 25-2.

## BROKER INFORMATION AND RATIFICATION OF FEE

Listing Broker has agreed to pay Other Broker 3% of the total sales price when Listing Broker's fee is received. Escrow Agent is authorized and directed to pay Other Broker from Listing Broker's fee at closing.

John Gorham                          0337639
Other Broker                         License No.

represents  ☒ Seller as Listing Broker's subagent
           ☐ Buyer only as Buyer's agent

John Crawford   0246462
Listing Broker    License No.

represents  ☐ Seller and Buyer as an intermediary
           ☒ Seller only as Seller's agent

Listing Associate                Telephone

Associate                Telephone

Selling Associate                Telephone

3516 Stone's Throw, Nacogdoches, TX 75965
Broker Address

Broker Address

936-564-1620
Telephone                Facsimile

Telephone                Facsimile

## RECEIPT

Receipt of ☒ Contract and ☒ $1000.00 Earnest Money in the form of CK no 1009 is acknowledged.

Escrow Agent

By: _____

131 Tenaha Street
Address
Center, TX
City          State     Zip Code

Date: _____

Telephone: (936) 598-6335
Facsimile: (936) 598-6388

01A          TREC NO.25-3

Tract 6:

Being a survey of 126.632 acres of land and being all of a called 115 1/2 acre tract recorded in Vol. 105, page No. 20, deed records of San Augustine County, Texas and being a part of the J. S. Collins Pre-Emption Survey, A-445 and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to wit:

BEGINNING: At the NW corner of said 115 1/2 acre tract being the NE corner of a 72.00 acre tract now

owned by W. L. Brown recorded in Vol. 133, page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N 11 1/4'W, 10.6 feet and a 9" Pine found marked "X" brs. N. 38 1/4'E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet.

THENCE: N 59° 09' 25"E, along the NBL of said 115 1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet.

THENCE: N 73° 43' 08"E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet.

THENCE: N 68° 31' 17"E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69 1/4'E, 22.5 feet.

THENCE: N 72° 18' 18"E, along said well marked line, to a Pine knot found set for corner, a distance of 110.18 feet from which a 14" Post Oak found marked "X" brs. S 81 1/4'W, 15.5 feet.

THENCE: N 65° 59' 25"E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32 3/4'E, 5.7 feet and a 16" Pine found marked "X" brs. N 62 1/4' W, 16.00 feet.

THENCE: S 88° 05' 47"E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58 1/2' W, 15.2 feet.

THENCE: S 49° 30' 48"E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet.

THENCE: S 8° 06' 20"E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36" Pen Oak found marked "X" brs. N 33 1/2' W, 1.5 feet and a 18" Pen Oak found marked "X" brs. S 46 E, 18.3 feet.

THENCE: S 19° 29' 42"E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S 79 1/2'W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7'.

THENCE: S 18° 30' 35"W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74 1/2'E, 4.6 feet.

THENCE: S 30° 55' 58"E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22 1/4'W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet.

THENCE: S 30° 11' 35"W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet.

THENCE: S 2° 09' 56"E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet.

THENCE: S 9° 14' 18"E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46 1/2' E, 5.5 feet and a 12" Pen Oak found marked "X"

THENCE: S 55° 52' 00"E, along said well marked line, 122.59 feet.

THENCE: S 39° 57' 49"E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet.

THENCE: S 3° 51' 54"W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet.

THENCE: S 31° 52' 54"E, along said well marked line to the SE corner of said 115 1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58 1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet.

THENCE: S 59° 12' 38"W, along the SBL of said 115 1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115 1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet.

THENCE: N 47° 50' 00"W, along a WBL of said 115 1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 0" Hackberry found marked "X" brs. S 81 1/2' E, 84.6 feet.

THENCE: N 11° 37'W, along a WBL of said 115 1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the place of beginning containing 126.632 acres of land.

# JOHN CRAWFORD
## REAL ESTATE BROKER
P. O. BOX 630165
NACOGDOCHES, TEXAS 75963-0165
936-564-6235

### FARM, RANCH OR ACREAGE SPECIAL LISTING AGREEMENT

Listing No.: _____                    Expires: June 15, 2002

Price: _____                      Acreage: 293.132 total

Owner: **Prud'homme, Gilbert**

**Austin, TX  78701**

Telephone: **512-476-0482**

Address Of
Property: _____

**Minerals**

Legal
Description: **Allen Dillard Survey A-98  166.5 acres**

**JS Collins + HH Hall Survey A445 & A404  126.632 ac.**

How Zoned: _____      Type of Property: **Timberland**

Borders:
Frontage:
Type of
Surface:

Nearest
Town: **San Augustine**          Miles: **10**

School: **San Augustine**

Utilities: **DET**

Real Estate
Taxes: **1997 total both tracts $105720**

-XXXVI-

## All Items Listed Above are Included at Price Stated on Page 1.

To: JOHN CRAWFORD

(A) I represent that his description is correct, that I have the legal right to sell the property described herein and that I can and will duly furnish a good and sufficient warranty deed and abstract showing a merchantable title (or deed and title insurance policy) to said property when sold.

(B) You are employed on an exclusive basis to procure a purchaser, ready, willing and able to buy said property at the price and upon terms as stated herein or as otherwise subsequently authorized by me, and to accept and give receipt for any money or deposits received in connection with the sale of said property.

(C) I agree to pay you forthwith as commission six per cent (6%) of the selling price, when a purchaser is procured through you, or your representative, at the stated price and terms, or any other price and terms acceptable to me.

(D) By this agreement, I give you the sole and exclusive right to sell the property described herein. If said property is sold during the term of this agreement at a price and upon terms acceptable to me to a purchaser procured by me or through agencies other than yours or by any other party whomsoever. I agree to pay you forthwith the amount of commission provided in Clause (C) above.

(E) The term "Sale" as used herein shall be deemed to include a sale or exchange.

(F) In the event there is a forfeiture of funds deposited or payment of funds as liquidated damages by a purchaser one-half of so forfeited or paid funds are to be retained by me, the balance shall be paid to you as commission.

(G) This contract shall remain in effect for __12__ months, and when terminated there shall be no charge for expenses, commission, or otherwise against me. However, if within __12__ months after the expiration of this contract, I sell said property to a purchaser procured through you, or your representative, I will forthwith pay the full commission as provided in Clause (C) above. *June '01 – June '02*

(H) I acknowledge that the listing of this property, and your endeavor to procure a purchaser for same, shall constitute a good and sufficient consideration for this agreement; that I have read the agreement and understand the contents thereof; that I have received an exact copy of same; and that no conditions or agreements exist other than those contained herein.

_____
Signature

*Managing Partner*
*Edw. M. A. Prudhomme*
*Beneficiaries Partnership*
*6/26/01*

ACCEPTED: JOHN CRAWFORD

_____

Dated this __15th__ day of __June__, 2001.

Law Office of Gilbert Pr... ... ... ...74 5562; ...un-26-01 17:05; Page 11;11
...ved: 8/28/01 15:23; 4085840235 -> Law Office of Gil...t Prud'homme; Page 2
JOHN CRAWFORD 4895646235 P.02

Farm and Ranch Contract                                          Page Eight   11-08-99

your attorney BEFORE signing.

Buyer's                                          Seller's
Attorney is:_____ _____        Attorney is:_____ _____

**23. NOTICES:** All notices from the parties to each other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile machine as follows:

**To Buyer at:**                                 **To Seller at:**

_____            _____

_____            _____

_____            _____

Telephone: (936) 564- 1551                       Telephone: (___) _____

Facsimile: (936) 564 -1561                       Facsimile: (___) _____

EXECUTED the ____day of _____ __ __ (THE EFFECTIVE DATE). (BROKER: FILL IN
THE DATE OF FINAL ACCEPTANCE.)

_____                  _____
Buyer   VP Southwood Timberlands Corp.           Seller Partner E. H + M A Prud'homme
                                                  Beneficiary Partnership
_____                  _____
Buyer                                            Seller

> The form of this contract has been approved by the Texas Real Estate Commission. Such approval relates to this contract form only. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transaction. It is not suitable for complex transactions. Extensive riders or additions are not to be used. Texas Real Estate Commission. P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC NO. 25-3. This form replaces TREC NO. 25-2.

## BROKER INFORMATION AND RATIFICATION OF FEE

Listing Broker has agreed to pay Other Broker ___3 %_____ of the total sales price when Listing Broker's fee is received. Escrow Agent is authorized and directed to pay Other Broker from Listing Broker's fee at closing.

JOHN GORHAM   0337639                            John Crawford   0246462
Other Broker            License No.              Listing Broker            License No.
represents  ☒ Seller as Listing Broker's subagent    represents  ☐ Seller and Buyer as an intermediary
            ☐ Buyer only as Buyer's agent                        ☒ Seller only as Seller's agent

                                                 _____  _____
                                                 Listing Associate          Telephone

_____  _____           _____  _____
Associate                   Telephone            Selling Associate          Telephone

_____                        _____
Broker Address                                   Broker Address

_____  _____           _____  _____
Telephone                   Facsimile            Telephone                  Facsimile

## RECEIPT

Receipt of ☐ Contract and ☐ $_____ Earnest Money in the form of_____is acknowledged.

Escrow Agent: _____          Date: _____

By:_____

_____                        Telephone: (___) _____
Address                                          Facsimile: (___) _____

COPY



**WALTER OR CAROLYN BOUNDS**
HIS TX DL 07806851 HER TX DL 07806853
431 KING STREET PH. 409-598-3414
CENTER, TX 75935

88-507/1131

1009

DATE July 3, 2001

PAY TO THE ORDER OF _John Griffin, escrow agent_    $ 1,000⁰⁰

—One Thousand & no/100 _____ DOLLARS 🔒 Contains Security Features. Details on Back.

**FARMERS STATE BANK**
LOCK DRAWER 352
CENTER, TX 75935
(409) 598-3311

Wally Bounds

FOR _____

⑈113105070⑈ 1009 ⑈0890057⑈02

MP

PRINTED ON RECYCLED PAPER USING VEGETABLE-BASED INKS

©CHECK GALLERY, 1995    STYLE # P01    1-800-354-3540    www.checkgallery.com

-XXXIX-

**TAB 4**
**(Prud'homme Partnership Deed)**

FILE NO. 4689
FILED 5th DAY OF 4102, 01
AT 2:05 O'CLOCK P M.
DIANA KOVAR, COUNTY CLERK
SAN AUGUSTINE CO., TEXAS
BY Carolyn L Marshall DEPUTY

SAN AUGUSTINE COUNTY ABSTRACT
File No. SA01-136,

## WARRANTY DEED

**Date:** September 7, 2001.

**Grantor:** Eck G. Prud'homme, Jr., Al Joseph Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, d/b/a E. G. and M. A. Prud'homme Beneficiaries Partnership.

**Grantor's Mailing Address** (including county): 1601 Rio Grande St., Suite 402, Austin, Travis County, Texas 78701.

**Grantee:** Walter Bounds and wife, Carolyn B. Bounds.

**Grantee's Mailing Address** (including county): 431 King Street, Center, Shelby County, Texas 75935.

**Consideration:** TEN AND NO/100 DOLLARS ($10.00) AND OTHER GOOD AND VALUABLE CONSIDERATION to Grantor paid, cash in hand, by Grantee herein, receipt of which is hereby acknowledged.

**Property** (including any improvements):

BEING a survey of 126.632 acres of land and being all of a called 115-1/2 acre tract recorded in Vol. 105, Page No. 20, Deed Records of San Augustine County, Texas, and being a part of the J. S. COLLINS PRE-EMPTION SURVEY, A-445, and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to-wit:

BEGINNING: At the NW corner of said 115-1/2 acre tract being the NE corner of a 72.00 acre tract now owned by W. L. Brown recorded in Vol. 133, Page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N. 11 1/4' W, 10.6 feet and a 9" Pine found marked "X" brs. N 38-1/4' E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet;

THENCE: N 59° 09' 25" E, along the NBL of said 115-1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet;

THENCE: N 73° 43' 08" E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet;

THENCE: N 68° 31' 17" E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69-1/4' E, 22.5 feet;

THENCE: N 72° 18' 18" E, along said well marked line, to a Pine knot found set for corner, a distance of 110.1 feet from which a 14" Post Oak found marked "X" brs. S 81-1/4' W, 15.5 feet;

THENCE: N 65° 59' 25" E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32-3/4' E, 5.7 feet and a 16" Pine found marked "X" brs. N 62-1/4' W, 16.00 feet;

THENCE: S 88° 05' 47" E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58-1/2' W, 15.2 feet;

THENCE: S 49° 38' 48" E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet;

THENCE: S 8° 06' 20" E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36" Pen Oak found marked "X" brs. N 33-1/2' W, 1.5 feet and a 18" Pen

CERTIFIED COPY
Page 1 of 5 pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

PLAINTIFF'S
EXHIBIT
5
2-25-15

-XLI-

Oak found marked "X" brs. S 46 E, 18.3 feet;

THENCE: S 19° 29' 42" E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S. 79-1/2' W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7';

THENCE: S 18° 30' 35" W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74-1/2' E, 4.6 feet;

THENCE: S 30° 55' 58" E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22-1/4' W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet;

THENCE: S 30° 11' 35" W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet;

THENCE: S 2° 09' 56" E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet;

THENCE: S 9° 14' 18" E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46-1/2' E, 5.5 feet and a 12" Pen Oak found marked "X" brs. 45-1/2' W, 5.9 feet;

THENCE: S 55° 52' 00" E, along said well marked line, 122.59 feet;

THENCE: S 39° 57' 49" E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet;

THENCE: S 3° 51' 54" W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet;

THENCE: S 31° 52' 54" E, along said well marked line to the SE corner of said 115-1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58-1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet;

THENCE: S 59° 12' 38" W, along the SBL of said 115-1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115-1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet;

THENCE: N 47° 58' 00" W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81-1/2' E, 84.6 feet;

THENCE: N 11° 37' W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the PLACE OF BEGINNING, containing 126.632 acres of land.

**Reservations from and Exceptions to Conveyance and Warranty:** TITLE to any of the oil, gas and other minerals, in, under and that may be produced from the above-described real property, together with all rights, privileges and immunities relating thereto, including the following:

-2-

CERTIFIED COPY
Page __2__ of __5__ pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

i. MINERAL RESERVATION as set forth in instrument from Roy Atkinson to V. R. Harlow, dated November 7, 1934, and recorded in Vol. 74, Page 542, Deed Records of San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interests, the royalties, bonuses and rentals in connection therewith.

ii. MINERAL RESERVATION as set forth in instrument from E. G. Prud'homme, et ux, to Eck G. Prud'homme, et al, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith.

Grantor, for the consideration and subject to the reservations from and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee, the property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

When the context requires, singular nouns and pronouns include the plural.

E. G. AND M. A. PRUD'HOMME
BENEFICIARIES PARTNERSHIP

_____
ECK G. PRUD'HOMME, JR.

_____
AL JOSEPH BREEN

_____
JOHN THOMAS PRUD'HOMME

_____
JOSEPH GILBERT PRUD'HOMME

_____
JOSEPH LYNN PRUD'HOMME

CERTIFIED COPY
Page 3 of 5 pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

-3-

-XLIII-

<u>ACKNOWLEDGMENTS</u>

STATE OF TEXAS          §
                        §
COUNTY OF TRAVIS        §

This instrument was acknowledged before me on the ___8___ day of September, 2001, by ECK G. PRUD'HOMME, JR., d/b/a E. G. and M. A. Prud'homme Beneficiaries Partnership.


NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

_____
Notary's Printed Name

My Commission Expires: _____

LARRY W. GASTON
MY COMMISSION EXPIRES
October 5, 2002

STATE OF TEXAS          §
                        §
COUNTY OF TRAVIS        §

This instrument was acknowledged before me on the ___8___ day of September, 2001, by AL JOSEPH BREENE, d/b/a E. G. and M. A. Prud'homme Beneficiaries Partnership.


NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

_____
Notary's Printed Name

My Commission Expires: _____

LARRY W. GASTON
MY COMMISSION EXPIRES
October 5, 2002

STATE OF TEXAS          §
                        §
COUNTY OF TRAVIS        §

This instrument was acknowledged before me on the ___8___ day of September, 2001, by JOHN THOMAS PRUD'HOMME, d/b/a E. G. and M. A. Prud'homme Beneficiaries Partnership.


NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

_____
Notary's Printed Name

My Commission Expires: _____

LARRY W. GASTON
MY COMMISSION EXPIRES
October 5, 2002

CERTIFIED COPY
Page ___4___ of ___5___ pages          -4-

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

STATE OF TEXAS       §
                     §
COUNTY OF TRAVIS     §

This instrument was acknowledged before me on the ___ day of September, 2001, by JOSEPH GILBERT PRUD'HOMME, d/b/a E. G. and M. A. Prud'homme Beneficiaries Partnership.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

Ronald Walleck
Notary's Printed Name

My Commission Expires: 8/25/05

STATE OF TEXAS       §
                     §
COUNTY OF TRAVIS     §

This instrument was acknowledged before me on the ___ day of September, 2001, by JOSEPH LYNN PRUD'HOMME, d/b/a E. G. and M. A. Prud'homme Beneficiaries Partnership.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

_____
Notary's Printed Name

My Commission Expires: _____

AFTER RECORDING RETURN TO: Griffin Law Offices, 131 Tenaha Street, Center, Texas 75935.

PREPARED IN THE LAW OFFICE OF: John D. Griffin.

CERTIFIED COPY
Page __5__ of __5__ pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____ Deputy

-5-

THE STATE OF TEXAS
COUNTY OF SAN AUGUSTINE COUNTY
I, Margo Noble, County Clerk of San Augustine County, Texas do hereby certify that the foregoing is a true and correct copy of the instruments as the same appears of record in my office in Vol. 24 , Page 20-24 , in the records of San Augustin County, Texas.
Witness by Official hand and seal of office
this 21st day of Aug , 2013 .

MARGO NOBLE, COUNTY CLERK
SAN AUGUSTINE COUNTY
By: _____ Deputy

**TAB 5**
**(Breen Deeds)**

FILE NO ___4690___
FILED _5th_ DAY OF _nov_, _01_
AT _2:05_ O'CLOCK _P_ M.
DIANA KOVAR, COUNTY CLERK
SAN AUGUSTINE CO., TEXAS
BY _Carolyn I. Marshall_ DEPUTY

SAN AUGUSTINE COUNTY ABSTRACT
File No. _SA01-135_

**WARRANTY DEED**

**Date:** September 7, 2001.

**Grantor:** Hal Joseph Breen, a single person, Individually and as Trustee of the Breen Family Trust and Personal Representative under the Last Will of Eleanor P. Breen.

**Grantor's Mailing Address** (including county): 4545 N. 36th Street, Ste. #108, Phoenix, Maricopa County, Arizona 85018.

**Grantee:** Walter Bounds and wife, Carolyn B. Bounds.

**Grantee's Mailing Address** (including county): 431 King Street, Center, Shelby County, Texas 75935.

**Consideration:** TEN AND NO/100 DOLLARS ($10.00) AND OTHER GOOD AND VALUABLE CONSIDERATION to Grantor paid, cash in hand, by Grantee herein, receipt of which is hereby acknowledged.

**Property** (including any improvements):

BEING a survey of 126.632 acres of land and being all of a called 115-1/2 acre tract recorded in Vol. 105, Page No. 20, Deed Records of San Augustine County, Texas, and being a part of the J. S. COLLINS PRE-EMPTION SURVEY, A-445, and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to-wit:

BEGINNING: At the NW corner of said 115-1/2 acre tract being the NE corner of a 72.00 acre tract now owned by W. L. Brown recorded in Vol. 133, Page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N. 11 1/4' W, 10.6 feet and a 9" Pine found marked "X" brs. N 38-1/4' E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet;

THENCE: N 59° 09' 25" E, along the NBL of said 115-1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet;

THENCE: N 73° 43' 08" E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet;

THENCE: N 68° 31' 17" E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69-1/4' E, 22.5 feet;

THENCE: N 72° 18' 18" E, along said well marked line, to a Pine knot found set for corner, a distance of 110.1 feet from which a 14" Post Oak found marked "X" brs. S 81-1/4' W, 15.5 feet;

THENCE: N 65° 59' 25" E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32-3/4' E, 5.7 feet and a 16" Pine found marked "X" brs. N 62-1/4' W, 16.00 feet;

THENCE: S 88° 05' 47" E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58-1/2' W, 15.2 feet;

THENCE: S 49° 38' 48" E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet;

THENCE: S 8° 06' 20" E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36" Pen Oak found marked "X" brs. N 33-1/2' W, 1.5 feet and a 18" Pen

CERTIFIED COPY

Page __1__ of __3__ pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _Carolyn Smith_, Deputy

PLAINTIFF'S EXHIBIT
6
2/25/15

Oak found marked "X" brs. S 46 E, 18.3 feet;

THENCE: S 19° 29' 42" E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S. 79-1/2' W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7';

THENCE: S 18° 30' 35" W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74-1/2' E, 4.6 feet;

THENCE: S 30° 55' 58" E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22-1/4' W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet;

THENCE: S 30° 11' 35" W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet;

THENCE: S 2° 09' 56" E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet;

THENCE: S 9° 14' 18" E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46-1/2' E, 5.5 feet and a 12" Pen Oak found marked "X" brs. 45-1/2' W, 5.9 feet;

THENCE: S 55° 52' 00" E, along said well marked line, 122.59 feet;

THENCE: S 39° 57' 49" E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet;

THENCE: S 3° 51' 54" W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet;

THENCE: S 31° 52' 54" E, along said well marked line to the SE corner of said 115-1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58-1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet;

THENCE: S 59° 12' 38" W, along the SBL of said 115-1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115-1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet;

THENCE: N 47° 58' 00" W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81-1/2' E, 84.6 feet;

THENCE: N 11° 37' W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the PLACE OF BEGINNING, containing 126.632 acres of land.

This Deed is intended to convey all of Grantor's interest in and to the above-described real property.

**Reservations from and Exceptions to Conveyance and Warranty:** TITLE to any of the oil, gas and other minerals, in, under and that may be produced from the above-described real property, together with all rights, privileges and immunities relating thereto, including

CERTIFIED COPY                     -2-
Page 2 of 3 pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: Carolyn Aneth , Deputy

the following:

i. MINERAL RESERVATION as set forth in instrument from Roy Atkinson to V. R. Harlow, dated November 7, 1934, and recorded in Vol. 74, Page 542, Deed Records of San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interests, the royalties, bonuses and rentals in connection therewith.

ii. MINERAL RESERVATION as set forth in instrument from E. G. Prud'homme, et ux, to Eck G. Prud'homme, et al, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith.

Grantor, for the consideration and subject to the reservations from and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee, the property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

When the context requires, singular nouns and pronouns include the plural.



HAL JOSEPH BREEN, Individually and as Trustee of the Breen Family Trust and Personal Representative under the Last Will of Eleanor P. Breen

**ACKNOWLEDGMENT**

STATE OF ARIZONA §
§
COUNTY OF MARICOPA §

This instrument was acknowledged before me on the ___9___ day of October, 2001, by HAL JOSEPH BREEN, Individually and as Trustee of the Breen Family Trust and Personal Representative under the Last Will of Eleanor P. Breen, and in the capacity therein stated.

OFFICIAL SEAL
GUY CILLESSEN
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires Feb. 26, 2005

NOTARY PUBLIC IN AND FOR THE STATE OF ARIZONA

Guy Cillessen
Notary's Printed Name

My Commission Expires: FEB 26, 2005

**AFTER RECORDING RETURN TO:** Griffin Law Offices, 131 Tenaha Street, Center, Texas 75935.

**PREPARED IN THE LAW OFFICE OF:** John D. Griffin.

CERTIFIED COPY

Page ___3___ of ___3___ pages

Margo Noble, County Clerk
San Augustine, County, Texas

By: _____ , Deputy

THE STATE OF TEXAS
COUNTY OF SAN AUGUSTINE COUNTY
- 3 - I, Margo Noble, County Clerk of San Augustine County, Texas do hereby certify that the foregoing is a true and correct copy of the instruments as the same appears of record in my office in Vol. 24 , Page 25-27 , in the records of San Augustin County, Texas.
Witness by Official hand and seal of office this 21 day of August , 2013 .

MARGO NOBLE, COUNTY CLERK
SAN AUGUSTINE COUNTY
By: _____ , Deputy

-XLIX-

FILE NO. __4691__
FILED __5th__ DAY OF __Nov__, __01__
AT __2:05__ O'CLOCK __P__ M.
DIANA KOVAR, COUNTY CLERK
SAN AUGUSTINE CO., TEXAS
BY __Carolyn J. Marshall__ DEPUTY

SAN AUGUSTINE COUNTY ABSTRACT
File No. __SA01-135__

**WARRANTY DEED**

**Date:** September 7, 2001.

**Grantor:** Peter A. Breen, Individually and as Successor Trustee of the Breen Family Trust, not joined by my spouse herein because the hereinafter described realty is my separate property and is not a part of our homestead, never having been claimed, intended, occupied or used as such.

**Grantor's Mailing Address** (including county): 704 Calle Espejo, Santa Fe, Sante Fe County, New Mexico 87505.

**Grantee:** Walter Bounds and wife, Carolyn B. Bounds.

**Grantee's Mailing Address** (including county): 431 King Street, Center, Shelby County, Texas 75935.

**Consideration:** TEN AND NO/100 DOLLARS ($10.00) AND OTHER GOOD AND VALUABLE CONSIDERATION to Grantor paid, cash in hand, by Grantee herein, receipt of which is hereby acknowledged.

**Property** (including any improvements):

BEING a survey of 126.632 acres of land and being all of a called 115-1/2 acre tract recorded in Vol. 105, Page No. 20, Deed Records of San Augustine County, Texas, and being a part of the J. S. COLLINS PRE-EMPTION SURVEY, A-445, and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to-wit:

BEGINNING: At the NW corner of said 115-1/2 acre tract being the NE corner of a 72.00 acre tract now owned by W. L. Brown recorded in Vol. 133, Page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N. 11 1/4' W, 10.6 feet and a 9" Pine found marked "X" brs. N 38-1/4' E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet;

THENCE: N 59° 09' 25" E, along the NBL of said 115-1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet;

THENCE: N 73° 43' 08" E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet;

THENCE: N 68° 31' 17" E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69-1/4' E, 22.5 feet;

THENCE: N 72° 18' 18" E, along said well marked line, to a Pine knot found set for corner, a distance of 110.1 feet from which a 14" Post Oak found marked "X" brs. S 81-1/4' W, 15.5 feet;

THENCE: N 65° 59' 25" E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32-3/4' E, 5.7 feet and a 16" Pine found marked "X" brs. N 62-1/4' W, 16.00 feet;

THENCE: S 88° 05' 47" E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58-1/2' W, 15.2 feet;

THENCE: S 49° 38' 48" E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet;

THENCE: S 8° 06' 20" E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36"

CERTIFIED COPY

Page __1__ of __3__ pages

Margo Noble, County Clerk
San Augustine, County, Texas

By: _____, Deputy

PLAINTIFF'S EXHIBIT
7
2/25/15

-L-

Pen Oak found marked "X" brs. N 33-1/2' W, 1.5 feet and a 18" Pen Oak found marked "X" brs. S 46 E, 18.3 feet;

THENCE: S 19° 29' 42" E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S. 79-1/2' W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7';

THENCE: S 18° 30' 35" W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74-1/2' E, 4.6 feet;

THENCE: S 30° 55' 58" E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22-1/4' W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet;

THENCE: S 30° 11' 35" W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet;

THENCE: S 2° 09' 56" E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet;

THENCE: S 9° 14' 18" E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46-1/2' E, 5.5 feet and a 12" Pen Oak found marked "X" brs. 45-1/2' W, 5.9 feet;

THENCE: S 55° 52' 00" E, along said well marked line, 122.59 feet;

THENCE: S 39° 57' 49" E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet;

THENCE: S 3° 51' 54" W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet;

THENCE: S 31° 52' 54" E, along said well marked line to the SE corner of said 115-1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58-1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet;

THENCE: S 59° 12' 38" W, along the SBL of said 115-1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115-1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet;

THENCE: N 47° 58' 00" W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81-1/2' E, 84.6 feet;

THENCE: N 11° 37' W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the PLACE OF BEGINNING, containing 126.632 acres of land.

This Deed is intended to convey all of Grantor's interest in and to the above-described real property.

**Reservations from and Exceptions to Conveyance and Warranty:** TITLE to any of the oil, gas and other minerals, in, under and that may be produced from the above-described real property, together with

-2-

CERTIFIED COPY
Page 2 of 3 pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

-LI-

all rights, privileges and immunities relating thereto, including the following:

i. MINERAL RESERVATION as set forth in instrument from Roy Atkinson to V. R. Harlow, dated November 7, 1934, and recorded in Vol. 74, Page 542, Deed Records of San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interests, the royalties, bonuses and rentals in connection therewith.

ii. MINERAL RESERVATION as set forth in instrument from E. G. Prud'homme, et ux, to Eck G. Prud'homme, et al, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith.

Grantor, for the consideration and subject to the reservations from and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee, the property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

When the context requires, singular nouns and pronouns include the plural.

PETER A. BREEN, Individually
and as Successor Trustee of
the Breen Family Trust

## ACKNOWLEDGMENT

STATE OF NEW MEXICO §
§
COUNTY OF SANTA FE §

This instrument was acknowledged before me on the ___ day of October, 2001, by PETER A. BREEN, Individually and as Successor Trustee of the Breen Family Trust, and in the capacity therein stated.

OFFICIAL SEAL
Diana C. Young
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 04/24/03

NOTARY PUBLIC IN AND FOR
THE STATE OF NEW MEXICO

Notary's Printed Name

My Commission Expires: 04/24/03

AFTER RECORDING RETURN TO: Griffin Law Offices, 131 Tenaha Street, Center, Texas 75935.

PREPARED IN THE LAW OFFICE OF: John D. Griffin.

-3-

THE STATE OF TEXAS
COUNTY OF SAN AUGUSTINE COUNTY
I, Margo Noble, County Clerk of San Augustine County, Texas do hereby certify that the foregoing is a true and correct copy of the instruments as the same appears of record in my office in Vol. ___, Page ___, in the records of San Augustin County, Texas.
Witness by Official hand and seal of office this ___ day of ___, 2013.

MARGO NOBLE, COUNTY CLERK
SAN AUGUSTINE COUNTY
By: _____, Deputy

CERTIFIED COPY
Page __3__ of __3__ pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

FILE NO _4692_

FILED _5th_ DAY OF _Nov._ _01_
AT _2:05_ O'CLOCK _P_ M.
DIANA KOVAR, COUNTY CLERK
SAN AUGUSTINE CO., TEXAS
BY _Carolyn J. Marshall_ DEPUTY

SAN AUGUSTINE COUNTY ABSTRACT

File No. _5A01-135_

## WARRANTY DEED

**Date:** September 7, 2001.

**Grantor:** Susan E. Breen, not joined by my spouse herein because the hereinafter described realty is my separate property and is not a part of our homestead, never having been claimed, intended, occupied or used as such.

**Grantor's Mailing Address** (including county): P. O. Box 152, Clifton, Greenlee County, Arizona 85253.

**Grantee:** Walter Bounds and wife, Carolyn B. Bounds.

**Grantee's Mailing Address** (including county): 431 King Street, Center, Shelby County, Texas 75935.

**Consideration:** TEN AND NO/100 DOLLARS ($10.00) AND OTHER GOOD AND VALUABLE CONSIDERATION to Grantor paid, cash in hand, by Grantee herein, receipt of which is hereby acknowledged.

**Property** (including any improvements):

BEING a survey of 126.632 acres of land and being all of a called 115-1/2 acre tract recorded in Vol. 105, Page No. 20, Deed Records of San Augustine County, Texas, and being a part of the J. S. COLLINS PRE-EMPTION SURVEY, A-445, and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to-wit:

BEGINNING: At the NW corner of said 115-1/2 acre tract being the NE corner of a 72.00 acre tract now owned by W. L. Brown recorded in Vol. 133, Page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N. 11 1/4' W, 10.6 feet and a 9" Pine found marked "X" brs. N 38-1/4' E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet;

THENCE: N 59° 09' 25" E, along the NBL of said 115-1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet;

THENCE: N 73° 43' 08" E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet;

THENCE: N 68° 31' 17" E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69-1/4' E, 22.5 feet;

THENCE: N 72° 18' 18" E, along said well marked line, to a Pine knot found set for corner, a distance of 110.1 feet from which a 14" Post Oak found marked "X" brs. S 81-1/4' W, 15.5 feet;

THENCE: N 65° 59' 25" E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32-3/4' E, 5.7 feet and a 16" Pine found marked "X" brs. N 62-1/4' W, 16.00 feet;

THENCE: S 88° 05' 47" E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58-1/2' W, 15.2 feet;

THENCE: S 49° 38' 48" E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet;

THENCE: S 8° 06' 20" E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36" Pen Oak found marked "X" brs. N 33-1/2' W, 1.5 feet and a 18" Pen

CERTIFIED COPY

Page _1_ of _3_ pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

PLAINTIFF'S
EXHIBIT
8
2/25/15

-LIII-

Oak found marked "X" brs. S 46 E, 18.3 feet;

THENCE: S 19° 29' 42" E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S. 79-1/2' W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7';

THENCE: S 18° 30' 35" W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74-1/2' E, 4.6 feet;

THENCE: S 30° 55' 58" E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22-1/4' W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet;

THENCE: S 30° 11' 35" W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet;

THENCE: S 2° 09' 56" E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet;

THENCE: S 9° 14' 18" E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46-1/2' E, 5.5 feet and a 12" Pen Oak found marked "X" brs. 45-1/2' W, 5.9 feet;

THENCE: S 55° 52' 00" E, along said well marked line, 122.59 feet;

THENCE: S 39° 57' 49" E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet;

THENCE: S 3° 51' 54" W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet;

THENCE: S 31° 52' 54" E, along said well marked line to the SE corner of said 115-1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58-1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet;

THENCE: S 59° 12' 38" W, along the SBL of said 115-1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115-1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet;

THENCE: N 47° 58' 00" W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81-1/2' E, 84.6 feet;

THENCE: N 11° 37' W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the PLACE OF BEGINNING, containing 126.632 acres of land.

This Deed is intended to convey all of Grantor's interest in and to the above-described real property.

**Reservations from and Exceptions to Conveyance and Warranty:** TITLE to any of the oil, gas and other minerals, in, under and that may be produced from the above-described real property, together with all rights, privileges and immunities relating thereto, including

-2-

CERTIFIED COPY
Page 2 of 3 pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

the following:

     i.  MINERAL RESERVATION as set forth in instrument from Roy Atkinson to V. R. Harlow, dated November 7, 1934, and recorded in Vol. 74, Page 542, Deed Records of San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interests, the royalties, bonuses and rentals in connection therewith.

     ii.  MINERAL RESERVATION as set forth in instrument from E. G. Prud'homme, et ux, to Eck G. Prud'homme, et al, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith.

     Grantor, for the consideration and subject to the reservations from and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee, the property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

     When the context requires, singular nouns and pronouns include the plural.

*Susan E. Breen*<br>SUSAN E. BREEN

**ACKNOWLEDGMENT**

STATE OF ARIZONA     §
                        §
COUNTY OF GREENLEE   §

     This instrument was acknowledged before me on the __5__ day of October, 2001, by SUSAN E. BREEN.

*Edwina Gray*<br>NOTARY PUBLIC IN AND FOR<br>THE STATE OF ARIZONA

Edwina Gray<br>Notary's Printed Name

My Commission Expires:

> EDWINA GRAY
> Notary Public—Arizona
> Greenlee County
> My Comm. Expires Aug 16, 2003

**AFTER RECORDING RETURN TO:** Griffin Law Offices, 131 Tenaha Street, Center, Texas 75935.

**PREPARED IN THE LAW OFFICE OF:** John D. Griffin.

**CERTIFIED COPY**

Page __3__ of __3__ pages

Margo Noble, County Clerk
San Augustine, County, Texas

By: _____, Deputy

THE STATE OF TEXAS
COUNTY OF SAN AUGUSTINE COUNTY
I, Margo Noble, County Clerk of San Augustine County, Texas do hereby certify that the foregoing is a true and correct copy of the instruments as the same appears of record in my office in Vol. 24 , Page 3-33, in the records of San Augustin County, Texas.
Witness by Official hand and seal of office
this 21st day of Aug. , 2013 .

MARGO NOBLE, COUNTY CLERK
SAN AUGUSTINE COUNTY
By _____ Deputy

34

FILE NO. 4693
FILED 5th DAY OF Nov. 01
AT 2:05 O'CLOCK P M.
DIANA KOVAR, COUNTY CLERK
SAN AUGUSTINE CO., TEXAS
BY Carolyn J. Marshall DEPUTY

SAN AUGUSTINE COUNTY ABSTRACT
File No. SA01-135

**WARRANTY DEED**

**Date:** September 7, 2001.

**Grantor:** Terence J. Breen, not joined by my spouse herein because the hereinafter described realty is my separate property and is not a part of our homestead, never having been claimed, intended, occupied or used as such.

**Grantor's Mailing Address** (including county): P. O. Box 952, Goliad, Goliad County, Texas 77963.

**Grantee:** Walter Bounds and wife, Carolyn B. Bounds.

**Grantee's Mailing Address** (including county): 431 King Street, Center, Shelby County, Texas 75935.

**Consideration:** TEN AND NO/100 DOLLARS ($10.00) AND OTHER GOOD AND VALUABLE CONSIDERATION to Grantor paid, cash in hand, by Grantee herein, receipt of which is hereby acknowledged.

**Property** (including any improvements):

BEING a survey of 126.632 acres of land and being all of a called 115-1/2 acre tract recorded in Vol. 105, Page No. 20, Deed Records of San Augustine County, Texas, and being a part of the J. S. COLLINS PRE-EMPTION SURVEY, A-445, and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to-wit:

BEGINNING: At the NW corner of said 115-1/2 acre tract being the NE corner of a 72.00 acre tract now owned by W. L. Brown recorded in Vol. 133, Page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N. 11 1/4' W, 10.6 feet and a 9" Pine found marked "X" brs. N 38-1/4' E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet;

THENCE: N 59° 09' 25" E, along the NBL of said 115-1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet;

THENCE: N 73° 43' 08" E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet;

THENCE: N 68° 31' 17" E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69-1/4' E, 22.5 feet;

THENCE: N 72° 18' 18" E, along said well marked line, to a Pine knot found set for corner, a distance of 110.1 feet from which a 14" Post Oak found marked "X" brs. S 81-1/4' W, 15.5 feet;

THENCE: N 65° 59' 25" E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32-3/4' E, 5.7 feet and a 16" Pine found marked "X" brs. N 62-1/4' W, 16.00 feet;

THENCE: S 88° 05' 47" E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58-1/2' W, 15.2 feet;

THENCE: S 49° 38' 48" E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet;

THENCE: S 8° 06' 20" E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36" Pen Oak found marked "X" brs. N 33-1/2' W, 1.5 feet and a 18" Pen

CERTIFIED COPY
Page 1 of 3 pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

PLAINTIFF'S
EXHIBIT
8A
2/25/15

Oak found marked "X" brs. S 46 E, 18.3 feet;

THENCE: S 19° 29' 42" E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S. 79-1/2' W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7';

THENCE: S 18° 30' 35" W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74-1/2' E, 4.6 feet;

THENCE: S 30° 55' 58" E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22-1/4' W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet;

THENCE: S 30° 11' 35" W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet;

THENCE: S 2° 09' 56" E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet;

THENCE: S 9° 14' 18" E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46-1/2' E, 5.5 feet and a 12" Pen Oak found marked "X" brs. 45-1/2' W, 5.9 feet;

THENCE: S 55° 52' 00" E, along said well marked line, 122.59 feet;

THENCE: S 39° 57' 49" E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet;

THENCE: S 3° 51' 54" W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet;

THENCE: S 31° 52' 54" E, along said well marked line to the SE corner of said 115-1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58-1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet;

THENCE: S 59° 12' 38" W, along the SBL of said 115-1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115-1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet;

THENCE: N 47° 58' 00" W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81-1/2' E, 84.6 feet;

THENCE: N 11° 37' W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the PLACE OF BEGINNING, containing 126.632 acres of land.

This Deed is intended to convey all of Grantor's interest in and to the above-described real property.

**Reservations from and Exceptions to Conveyance and Warranty:** TITLE to any of the oil, gas and other minerals, in, under and that may be produced from the above-described real property, together with all rights, privileges and immunities relating thereto, including

-2-

CERTIFIED COPY

Page __2__ of __3__ pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _____, Deputy

the following:

i. MINERAL RESERVATION as set forth in instrument from Roy Atkinson to V. R. Harlow, dated November 7, 1934, and recorded in Vol. 74, Page 542, Deed Records of San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interests, the royalties, bonuses and rentals in connection therewith.

ii. MINERAL RESERVATION as set forth in instrument from E. G. Prud'homme, et ux, to Eck G. Prud'homme, et al, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith.

Grantor, for the consideration and subject to the reservations from and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee, the property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

When the context requires, singular nouns and pronouns include the plural.

_____
TERENCE J. BREEN

**ACKNOWLEDGMENT**

STATE OF TEXAS          §
                        §
COUNTY OF GOLIAD        §

This instrument was acknowledged before me on the 17th day of October, 2001, by TERENCE J. BREEN.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

Emi Riemenschneider
Notary's Printed Name

My Commission Expires: 11-23-02

EMI RIEMENSCHEIDER
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 11-23-2002

**AFTER RECORDING RETURN TO:** Griffin Law Offices, 131 Tenaha Street, Center, Texas 75935.

**PREPARED IN THE LAW OFFICE OF:** John D. Griffin.

-3-

THE STATE OF TEXAS
COUNTY OF SAN AUGUSTINE COUNTY
I, Margo Noble, County Clerk of San Augustine County, Texas do hereby certify that the foregoing is a true and correct copy of the instruments as the same appears of record in my office in Vol. 24 , Page 34-36 in the records of San Augustin County, Texas.
Witness by Official hand and seal of office this 21st day of Aug. , 2013 .

MARGO NOBLE, COUNTY CLERK
SAN AUGUSTINE COUNTY
By Lindsey Bush, Deputy

CERTIFIED COPY
Page 3 of 3 pages

Margo Noble, County Clerk
San Augustine, County, Texas
By _____, Deputy

FILE NO. 4694
FILED 5th DAY OF Nov, 01
AT 2:05 O'CLOCK P M.
DIANA KOVAR, COUNTY CLERK
SAN AUGUSTINE CO., TEXAS
BY Carolyn 2. Marshall DEPUTY

SAN AUGUSTINE COUNTY ABSTRACT
File No. SA01-135

## WARRANTY DEED

**Date:** September 7, 2001.

**Grantor:** Janet M. Breen Sutro, not joined by my spouse herein because the hereinafter described realty is my separate property and is not a part of our homestead, never having been claimed, intended, occupied or used as such.

**Grantor's Mailing Address** (including county): 5348 S. Osage Ave. Sierra Vista, Cochise County, Arizona 85650.

**Grantee:** Walter Bounds and wife, Carolyn B. Bounds.

**Grantee's Mailing Address** (including county): 431 King Street, Center, Shelby County, Texas 75935.

**Consideration:** TEN AND NO/100 DOLLARS ($10.00) AND OTHER GOOD AND VALUABLE CONSIDERATION to Grantor paid, cash in hand, by Grantee herein, receipt of which is hereby acknowledged.

**Property** (including any improvements):

BEING a survey of 126.632 acres of land and being all of a called 115-1/2 acre tract recorded in Vol. 105, Page No. 20, Deed Records of San Augustine County, Texas, and being a part of the J. S. COLLINS PRE-EMPTION SURVEY, A-445, and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to-wit:

BEGINNING: At the NW corner of said 115-1/2 acre tract being the NE corner of a 72.00 acre tract now owned by W. L. Brown recorded in Vol. 133, Page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N. 11 1/4' W, 10.6 feet and a 9" Pine found marked "X" brs. N 38-1/4' E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet;

THENCE: N 59° 09' 25" E, along the NBL of said 115-1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet;

THENCE: N 73° 43' 08" E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet;

THENCE: N 68° 31' 17" E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69-1/4' E, 22.5 feet;

THENCE: N 72° 18' 18" E, along said well marked line, to a Pine knot found set for corner, a distance of 110.1 feet from which a 14" Post Oak found marked "X" brs. S 81-1/4' W, 15.5 feet;

THENCE: N 65° 59' 25" E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32-3/4' E, 5.7 feet and a 16" Pine found marked "X" brs. N 62-1/4' W, 16.00 feet;

THENCE: S 88° 05' 47" E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58-1/2' W, 15.2 feet;

THENCE: S 49° 38' 48" E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet;

THENCE: S 8° 06' 20" E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36" Pen Oak found marked "X" brs. N 33-1/2' W, 1.5 feet and a 18" Pen

CERTIFIED COPY
Page 1 of 3 pages

Margo Noble, County Clerk
San Augustine County, Texas
By: Carolyn Smith , Deputy



PLAINTIFF'S
EXHIBIT
9
2/25/15    SA01-135

Oak found marked "X" brs. S 46 E, 18.3 feet;

THENCE: S 19° 29' 42" E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S. 79-1/2' W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7';

THENCE: S 18° 30' 35" W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74-1/2' E, 4.6 feet;

THENCE: S 30° 55' 58" E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22-1/4' W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet;

THENCE: S 30° 11' 35" W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet;

THENCE: S 2° 09' 56" E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet;

THENCE: S 9° 14' 18" E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46-1/2' E, 5.5 feet and a 12" Pen Oak found marked "X" brs. 45-1/2' W, 5.9 feet;

THENCE: S 55° 52' 00" E, along said well marked line, 122.59 feet;

THENCE: S 39° 57' 49" E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet;

THENCE: S 3° 51' 54" W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet;

THENCE: S 31° 52' 54" E, along said well marked line to the SE corner of said 115-1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58-1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet;

THENCE: S 59° 12' 38" W, along the SBL of said 115-1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115-1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet;

THENCE: N 47° 58' 00" W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81-1/2' E, 84.6 feet;

THENCE: N 11° 37' W, along a WBL of said 115-1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the PLACE OF BEGINNING, containing 126.632 acres of land.

This Deed is intended to convey all of Grantor's interest in and to the above-described real property.

**Reservations from and Exceptions to Conveyance and Warranty:** TITLE to any of the oil, gas and other minerals, in, under and that may be produced from the above-described real property, together with all rights, privileges and immunities relating thereto, including

-2-

CERTIFIED COPY

Page __2__ of __3__ pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: _Carolyn Smith_ , Deputy

the following:

    i.  MINERAL RESERVATION as set forth in instrument from Roy Atkinson to V. R. Harlow, dated November 7, 1934, and recorded in Vol. 74, Page 542, Deed Records of San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interests, the royalties, bonuses and rentals in connection therewith.

    ii.  MINERAL RESERVATION as set forth in instrument from E. G. Prud'homme, et ux, to Eck G. Prud'homme, et al, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, reserving one-half (1/2) of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith.

    Grantor, for the consideration and subject to the reservations from and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee, the property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

    When the context requires, singular nouns and pronouns include the plural.

JANET M. BREEN SUTRO

**ACKNOWLEDGMENT**

STATE OF ARIZONA    §
                  §
COUNTY OF COCHISE   §

    This instrument was acknowledged before me on the 09 day of October, 2001, by JANET M. BREEN SUTRO.

NOTARY PUBLIC IN AND FOR
THE STATE OF ARIZONA

Roseanne Mattingly
Notary's Printed Name

My Commission Expires: 07-02-04

ROSEANNE MATTINGLY
Notary Public - Arizona
Cochise County
My Commission Expires

**AFTER RECORDING RETURN TO:** Griffin Law Offices, 131 Tenaha Street, Center, Texas 75935.

**PREPARED IN THE LAW OFFICE OF:** John D. Griffin.

-3-

**CERTIFIED COPY**

Page 3 of 3 pages

Margo Noble, County Clerk
San Augustine, County, Texas
By: Carolyn Smith , Deputy

THE STATE OF TEXAS
COUNTY OF SAN AUGUSTINE COUNTY
I, Margo Noble, County Clerk of San Augustine County, Texas do hereby certify that the foregoing is a true and correct copy of the instruments as the same appears of record in my office in Vol. 24 , Page 37-39 , in the records of San Augustin County, Texas. Witness by Official hand and seal of office this 21st day of August , 2013 .

MARGO NOBLE, COUNTY CLERK
SAN AUGUSTINE COUNTY
By: Carolyn Smith , Deputy

**TAB 6**
**(Title Insurance Commitment No. SA01-135 Schedules)**



# SCHEDULE A

Effective Date:   July 13th, 2001, @ 08:00 AM.

Commitment No. SA01-135, issued  July 20, 2001

1.      Policy or policies to be issued are:

     (a)  OWNER POLICY OF TITLE INSURANCE (Form T-1)
        (Not applicable for improved one-to-four family residential real estate)

        Policy Amount: $101,300.00
        Proposed Insured: Walter Bounds and Carolyn Bounds

     (b)  TEXAS RESIDENTIAL OWNER POLICY OF TITLE INSURANCE
        -- ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)

        Policy Amount:
        Proposed Insured:

     (c)  MORTGAGEE POLICY OF TITLE INSURANCE (Form T-2)

        Policy Amount:
        Proposed Insured:
        Proposed Borrower:

     (d)  MORTGAGEE TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)

        Policy Amount:
        Proposed Insured:
        Proposed Borrower:

     (e)  OTHER

        Policy Amount:
        Proposed Insured:

2.      The interest in the land covered by this Commitment is : Fee Simple – Surface Estate Only

3.      Record title to the land on the Effective Date appears to be vested in :

Eck G. Prud'homme, Jr., Eleanor Prud'homme Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme, DBA E.G. and M.A. Prud'homme Beneficiaries Partnership



EXHIBIT
D-23
2-25-15

PRU_0122

**-LXIII-**

4.    Legal description of the land:

Being 126.625 acres of land, more or less, a part of J.S. COLLINS SURVEY, A-445, San Augustine County, Texas, and being the land described as Tract Six in the deed from E.G. Prud'homme, Sr. and wife, Mary Anderson Young Prud'homme, to Eck G. Prud'homme, Jr., Eleanor Prud'homme Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme DBA the E.G. and M.A. Prud'homme Beneficiaries Partnership, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, and being more particularly described in Exhibit "A" attached hereto and made a part hereof for all intents and purposes.

PRU_0123

## EXHIBIT "A"

Being a survey of 126.632 acres of land and being all of a called 115 1/2 acre tract recorded in Vol. 105, page No. 20, deed records of San Augustine County, Texas and being a part of the J. S. Collins Pre-Emption Survey, A-445 and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to wit:

BEGINNING: At the NW corner of said 115 1/2 acre tract being the NE corner of a 72.00 acre tract now owned by W. L. Brown recorded in Vol. 133, page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N 11 1/4'W, 10.6 feet and a 9" Pine found marked "X" brs. N. 38 1/4'E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet.

THENCE: N 59° 09' 25"E, along the NBL of said 115 1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet.

THENCE: N 73° 43' 08"E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet.

THENCE: N 68° 31' 17"E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69 1/4'E, 22.5 feet.

THENCE: N 72° 18' 18"E, along said well marked line, to a Pine knot found set for corner, a distance of 110.18 feet from which a 14" Post Oak found marked "X" brs. S 81 1/4'W, 15.5 feet.

THENCE: N 65° 59' 25"E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32 3/4'E, 5.7 feet and a 16" Pine found marked "X" brs. N 62 1/4' W, 16.00 feet.

THENCE: S 88° 05' 47"E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58 1/2' W, 15.2 feet.

THENCE: S 49° 38' 48"E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet.

THENCE: S 8° 06' 20"E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36" Pen Oak found marked "X" brs. N 33 1/2' W. 1.5 feet and a 18" Pen Oak found marked "X" brs. S 46 E, 18.3 feet.

THENCE: S 19° 29' 42"E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S 79 1/2'W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7'.

THENCE: S 18° 30' 35"W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74 1/2'E, 4.6 feet.

THENCE: S 30° 55' 58"E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22 1/4'W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet.

THENCE: S 30° 11' 35"W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet.

THENCE: S 2° 09' 56"E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet.

THENCE: S 9° 14' 18"E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46 1/2' E, 5.5 feet and a 12" Pen Oak found marked "X"

PRU_0124

brs. 45 1/2' W, 5.9 feet.

THENCE: S 55° 52' 00"E, along said well marked line, 122.59 feet.

THENCE: S 39° 57' 49"E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet.

THENCE: S 3° 51' 54"W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet.

THENCE: S 31° 52' 54"E, along said well marked line to the SE corner of said 115 1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58 1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet.

THENCE: S 59° 12' 38"W, along the SBL of said 115 1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115 1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet.

THENCE: N 47° 58' 00"W, along a WBL of said 115 1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81 1/2' E, 84.6 feet.

THENCE: N 11° 37'W, along a WBL of said 115 1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the place of beginning containing 126.632 acres of land.

PRU_0125

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, cost, attorney's fees, and expenses resulting from:

1. The following restrictive covenants of record itemized below (We must insert specific recording data or delete this exception): THIS EXCEPTION IS HEREBY DELETED.

2. Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3. Homestead or community property or survivorship rights, if any, of any spouse of any insured. (Applies to the Owner Policy Only.)

4. Any titles or rights asserted by anyone, including but not limited to, persons, the public, corporations, governments or other entities,
   a. to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or
   b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or
   c. to filled-in lands, or artificial islands, or
   d. to statutory water rights, including riparian rights, or
   e. to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area. (Applies to the Owner Policy Only.)

5. Standby fees, taxes and assessments by any taxing authority for the year 2001, and subsequent years, and subsequent assessments by any taxing authority for prior years due to change in land usage or ownership, but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of Improvements not assessed for a previous tax year.

6. The terms and conditions of the documents creating your interest in the land.

7. Materials furnished or labor performed in connection with planned construction before signing and delivering the lien documents described in Schedule A, if the land is part of the homestead of the owner. (Applies to the Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before a binder is issued.)

8. Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage. (Applies to Mortgagee Policy Only.)

9. The following matters and all terms of the documents creating or offering evidence of the matters. (We must insert matters or delete this exception.):

a. Rights of Parties in Possession. (Owner's Title Policy Only)

b. All visible and apparent easements, whether for street, road, utility or other purposes.

c. The acreage content in the legal description is of the property herein insured is specifically excepted from the coverage of this Policy.

d. Any portion of the herein described property lying within the boundary of any roadway.

e. The Tax Certificate issued by the Taxing Authorities is issued on Real Property only. It does not include taxes on the mineral estate and/or personal property, therefore, no liabiltiy is assumed hereunder for the payment of said taxes on the mineral estate and/or personal property.

f. Title to any of the oil, gas and other minerals in, under and that may be produced from the insured premises, together with all rights, privileges and immunities relating thereto. The following is provided for informational purposes only:
i. Mineral Reservation as set forth in instrument from Roy Atkinson to V.R. Harlow, dated November 7, 1934, and recorded in Vol. 74, Page 542, Deed Records of San Augustine County, Texas, reserving 1/2 of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith.
ii. Mineral Reservation as set forth in instrument from E.G. Prud'homme et ux, to Eck G. Prud'homme, et al, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, reserving 1/2 of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith.
Title to said interest has not been investigated subsequent to the date of aforesaid instrument.

g. Lack of right of access to and from the subject property.

**SCHEDULE C**
**REQUIREMENTS**

Your Policy will not cover loss, costs, attorney's fees, and expenses resulting from the following requirements that will appear of record as exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date of the Policy is issued:

1. Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

2. Satisfactory evidence must be provided that:
   a. No person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A;
   b. All standby fees, taxes, assessments and charges against the property have been paid;
   c. All improvements or repairs to the property are completed and accepted by the owner, and that all contractors, subcontractors, laborers and suppliers have been fully paid, and that no mechanic's, laborers or materialman's liens have attached to the property;
   d. There is legal access to and from the land;
   e. (On a Mortgagee Policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

3. You must pay the seller or borrower the agreed amount for your property or interest.

4. Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

   (a) The title insurance policy being issued to you contains an arbitration provision. It allows you or the Company to require arbitration if the amount of insurance is $1,000,000.00 or less. If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued. If you are the lender in the transaction and elect to deletion of the arbitration provision, please inform us through your loan closing instructions. (Not applicable to Texas Residential Owners Policy, one-to-four Family Residential Property). (FORM ATTACHED)

   (b) Execution and Delivery of a Tax Certificate, showing payment to all appropriate taxing authorities of all taxes, through and including those for the year 2000.

   (c) Execution and Delivery of a Waiver of Inspection by from the proposed Buyer(s).

   (d) Execution and Delivery of an Affidavit of Debts and Liens by the proposed Seller(s).

   (e) Obtain and provide San Augustine County Abstract Company with a file-stamped copy of all recorded documents.

   (f) Provide San Augustine County Abstract Company with a copy of completed Settlement Statement.

   (g) Execution, Delivery and Recordation of a Warranty Deed from Eck G. Prud'homme, Jr., Eleanor Prud'homme Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme DBA E.G. & M.A. Prud'homme Beneficiares Partnership, to

Walter Bounds and wife, Carolyn Bounds, conveying the property described on Schedule A herein.

(h) Execution, Delivery and Recordation of a Release of Lien from Republic Bank, South Austin, to Joseph Gilbert Prud'homme, releasing a note in the principal amount of $253,318.98, payable to Republic Bank, South Austin, said note being secured by a deed of trust lien created by Deed of Trust executed by Prud'homme Oil Partnership, Ltd. to Republic Bank, South Austin, dated May 19, 1986, recorded in Vol. 69, Page 155, Deed of Trust Records, San Augustine County, Texas; and being thereafter renewed and extended by the following: 1) Instrument dated December 31, 1986, recorded in Vol. 71, Page 255, Deed of Trust Records, San Augustine County, Texas; 2) Instrument dated April 21, 1987, recorded in Vol. 71, Page 695, Deed of Trust Records, San Augustine County, Texas; and 3) Instrument dated September 30, 1987, recorded in Vol. 73, Page 175, Deed of Trust Records, San Augustine County, Texas.

PRU_0129

# COMMITMENT FOR TITLE INSURANCE

## SCHEDULE D

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of San Augustine County Abstract Company in the State of Texas, the following disclosures are made:

1.       The following individuals are directors and/or officers, as indicated of Title Insurance Company.

As to United General Title Insurance Company the following disclosures are made:

1. The following individuals are directors and/or officers, as indicated of the Title Insurance Company.

John P. Dwyer, Jr., C.E.O. & President
Barbara J. Coleman, Treasurer
Robert T. Edwards, Sr. Vice President
Patricia A. Garcia, Sr. Vice President, Secretary

Directors: John P. Dwyer, Jr., Charles A. Garney, Harry W. Rhulen, Peter H. Foley, Patricia A. Garcia

United General Holding Company owns 100% of the stock of United General Title Insurance Company, Inc. Frontier Insurance Company, Charles A. Garney and John P. Dwyer, Jr. each own more than 10% of the stock of United General Financial Services, Inc.

2.       The following disclosures are made by the Title Insurance Agent issuing this commitment:

San Augustine County Abstract Company is owned by J. Ken Muckelroy -- 100%.

3.       You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates. Upon your request, such disclosure will be made to you. Additionally, the name of any person, firm or corporation receiving any sum from the settlement of this transaction will be disclosed on the closing or settlement statement.

You are further advised that the estimated title premium* is:

| | |
|---|---|
| Owners Policy | $1,000.00 |
| Mortgage Policy | $ |
| Endorsement Charges | $ |
| Other | $ |
| Total | $1,000.00 |

Of this total amount: 15.00% will be paid to the policy issuing Title Insurance Company; 85.00% will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

| Amount | To Whom | For Services |
|---|---|---|
| 30% | Muckelroy Title Services, Inc. | Closing/Examination |

*The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance. Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the State Board of Insurance.

This commitment is invalid unless the insuring provisions and Schedules A, B, and C are attached.

PRU_0130

-LXXI-

## DELETION OF ARBITRATION PROVISION
(Not applicable to the Texas Residential Owner Policy)

ARBITRATION is a common form of alternative dispute resolution. It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company. However, if you agree to arbitrate, you give up your right to take the Title Company to court and your rights to discovery of evidence may be limited in the arbitration process. In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below). It allows you or the Company to require arbitration if the amount of insurance is $1,000,000.00 or less. If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued. You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

The Arbitration provision in the Policy is as follows:

"Unless prohibited by applicable law or unless this arbitration section in deleted by specific provision in Schedule B of this policy, either the Company of the Insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this Policy, and service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000.00 or less SHALL BE arbitrated at the request of either the Company or the Insured, unless the insured is an individual person (as distinguished from a corporation, trust, partnership, association or other legal entity). All arbitrable matters when the Amount of Insurance is in excess of $1,000,000.00 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this Policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the Insured, the rules in effect at the Date of Policy shall be binding upon the parties. The award may include attorney's fees only if the laws of the state in which the land is located permit a court to award attorney's fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request."

I request deletion of the Arbitration provision.


_____          _____
SIGNATURE                                          DATE

**TAB 7**
**(Bounds' Title Insurance Policy)**

Policy
Number

OWNER POLICY OF TITLE INSURANCE № 98272565

Issued by

# UNITED GENERAL
# TITLE INSURANCE COMPANY



COPY

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, UNITED GENERAL TITLE INSURANCE COMPANY, a Louisiana corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

2. Any defect in or lien or encumbrance on the title;

3. Any statutory or constitutional mechanic's, contractor's, or materialmen's lien for labor or material having its inception on or before Date of Policy.

4. Lack of a right of access to and from the land.

5. Lack of good and indefeasible title.

The Company also will pay the costs, attorney's fees and expenses incurred in defense of the title as insured, but only to the extent provided in the Conditions and Stipulations.

In Witness Whereof, United General Title Insurance Company has caused its corporate name and seal to be hereunto affixed by its duly authorized officers as of Date of Policy shown in Schedule A.

**UNITED GENERAL TITLE INSURANCE COMPANY**

_____
President

_____
Secretary

Countersigned _____
Authorized Officer or Agent

This policy is valid only if Schedules A and B are attached and countersigned.

Texas Owner Policy (T-1) (1-93)
UGT Form 3001

EXHIBIT
D-24
2-25-15

PRU_0132

XXIV-

# EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking that has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

(a) created, suffered, assumed or agreed to by the insured claimant;

(b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

(c) resulting in no loss or damage to the insured claimant;

(d) attaching or created subsequent to Date of Policy;

(e) resulting in loss or damage that would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

4. The refusal of any person to purchase, lease or lend money on the estate or interest covered hereby in the land described in Schedule A because of unmarketability of the title.

5. Any claim, which arises out of the transaction vesting in the person named in paragraph 3 of Schedule A the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or other state of federal creditors' rights laws that is based on either (i) the transaction creating the interest insured by this Policy being deemed a fraudulent conveyance or fraudulent transfer or a voidable distribution or voidable dividend, (ii) the subordination or recharacterization of the estate or interest insured by this Policy as a result of the application of the doctrine of equitable subordination or (iii) the transaction creating the estate or interest insured by this Policy being deemed a preferential transfer except where the preferential transfer results from the failure of the Company or its issuing agent to timely file for record the instrument of transfer to the insured after delivery or the failure of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

# CONDITIONS AND STIPULATIONS

## 1. DEFINITION OF TERMS.

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A, and, subject to any rights or defenses the Company would have had against the named insured, those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate, partnership, or fiduciary successors and specifically, without limitation, the following:

(i) the successors in interest to a corporation resulting from merger or consolidation or the distribution of the assets of the corporation upon partial or complete liquidation;

(ii) the partnership successors in interest to a general or limited partnership which dissolves but does not terminate;

(iii) the successors in interest to a general or limited partnership resulting from the distribution of the assets of the general or limited partnership upon partial or complete liquidation;

(iv) the successors in interest to a joint venture resulting from the distribution of the assets of the joint venture upon partial or complete liquidation;

(v) the successor or substitute trustee(s) of a trustee named in a written trust instrument; or

(vi) the successors in interest to a trustee or trust resulting from the distribution of all or part of the assets of the trust to the beneficiaries thereof.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice that may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1 (a)(iv) of the Exclusions From Coverage, "public records" also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "access": legal right of access to the land and not the physical condition of access. The coverage provided as to access does not assure the adequacy of access for the use intended.

## 2. CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE.

The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

## 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest that is adverse to the title to the estate or interest, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

When, after the date of the policy, the insured notifies the Companies as required herein of a lien, encumbrance, adverse claim or other defect in title to the estate or interest as insured that is not excluded or excepted from the coverage of this policy, the Company shall promptly investigate the charge to determine whether the lien, encumbrance, adverse claim or defect is valid and not barred by virtue of statute. The Company shall notify the insured in writing, within a reasonable time, of its determination as to the validity or invalidity of the insured's claim or charge under the policy. If the Company concludes that the lien, encumbrance, adverse claim or defect is not covered by this policy, or was otherwise addressed in the closing of the transaction in connection with which this policy was issued, the Company shall specifically advise the insured of the reasons for its determination. If the Company concludes that the lien, encumbrance, adverse claim or defect is valid, the Company shall take one of the following actions: (i) institute the necessary proceedings to clear the lien, encumbrance, adverse claim or defect from the title to the estate as insured; (ii) indemnify the insured as provided in this policy; (iii) upon payment of appropriate premium and charges therefor, issue to the insured claimant or to a subsequent owner, mortgagee or holder of the estate or interest in the land insured by this policy, a policy of title insurance without exception for the lien, encumbrance, adverse claim or defect, said policy to be in an amount equal to the current value of the property or, if a mortgagee policy, the amount of the loan; (iv) indemnify another title insurance company in connection with its issuance of a policy(ies) of title insurance without exception for the lien, encumbrance, adverse claim or defect; (v) secure a release or other document discharging the lien, encumbrance, adverse claim or defect; or (vi) undertake a combination of (i) through (v) herein.

## 4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any

## SCHEDULE A

Policy No.: 98272565                                         File No.: SA01-135

Transaction Code(s): 1000

Amount of Insurance: $101,300.00

Premium: $1,000.00

Date of Policy: November 5, 2001, at 2:05 P.M.

1.      Name of Insured:

Walter Bounds and Carolyn B. Bounds

2.      The estate or interest in the land which is covered by this policy is:

Fee Simple Surface Estate Only

3.      Title to the estate or interest in the land is insured as vested in:

Walter Bounds and wife, Carolyn B. Bounds

4.      The land referred to in this policy is described as follows:

Being 126.625 acres of land, more or less, a part of J. S. COLLINS SURVEY, A-445, San Augustine County, Texas, and being the land described as Tract Six in the deed from E. G. Prud'homme, Sr. and wife, Mary Anderson Young Prud'homme, to Eck G. Prud'homme, Jr., Eleanor Prud'homme Breen, John Thomas Prud'homme, Joseph Gilbert Prud'homme, and Joseph Lynn Prud'homme DBA the E. G. and M. A. Prud'homme Beneficiaries Partnership, dated May 22, 1971, recorded in Vol. 166, Page 239, Deed Records, San Augustine County, Texas, and being more particularly described in Exhibit "A" attached hereto and made a part hereof for all intents and purposes.

Countersigned: _____
                    Authorized Officer or Agent

Being a survey of 126.632 acres of land and being all of a called 115 1/2 acre tract recorded in Vol. 105, page No. 20, deed records of San Augustine County, Texas and being a part of the J. S. Collins Pre-Emption Survey, A-445 and being located approximately 15 miles SW of the courthouse in San Augustine, Texas, and being more particularly described by metes and bounds, to wit:

BEGINNING: At the NW corner of said 115 1/2 acre tract being the NE corner of a 72.00 acre tract now owned by W. L. Brown recorded in Vol. 133, page No. 468, a 3/8" Reinf. Rod for corner in the NWBL of said J. S. Collins Survey from which a 13" Sweetgum found marked "X" brs. N 11 1/4'W, 10.6 feet and a 9" Pine found marked "X" brs. N. 38 1/4'E, 18.7 feet and a 10" Sweetgum found marked "X" brs. S 43 E, 24.00 feet.

THENCE: N 59° 09' 25"E, along the NBL of said 115 1/2 acre tract and the SBL of a tract now owned by Kirby Lumber Co. and a well marked line, 1364.63 feet a 3/8" Reinf. Rod for corner from which a 14" Post Oak found marked "X" brs. N 48 E, 8.9 feet.

THENCE: N 73° 43' 08"E, along a well marked line to a Pine knot found set for corner, a distance of 59.57 feet from which a 12" Sweetgum found marked "X" brs. S 81 W, 11.3 feet.

THENCE: N 68° 31' 17"E, along said well marked line to a Pine knot found set for corner, a distance of 161.11 feet from which a 24" Post Oak found marked "X" brs. N. 69 1/4'E, 22.5 feet.

THENCE: N 72° 18' 18"E, along said well marked line, to a Pine knot found set for corner, a distance of 110.18 feet from which a 14" Post Oak found marked "X" brs. S 81 1/4'W, 15.5 feet.

THENCE: N 65° 59' 25"E, along said well marked line, 177.64 feet a 3/8" Reinf. Rod for corner from which a 18" Pine found marked "X" brs. N 32 3/4'E, 5.7 feet and a 16" Pine found marked "X" brs. N 62 1/4' W, 16.00 feet.

THENCE: S 88° 05' 47"E, along said well marked line to a Pine knot found set for corner, a distance of 273.35 feet from which a 14" Blackgum found marked "X" brs. N 58 1/2' W, 15.2 feet.

THENCE: S 49° 38' 48"E, along said well marked line to a Pine knot found set for corner, a distance of 194.30 feet a 14" Sweet Bay found marked "X" brs. S 25 E, 25.7 feet.

THENCE: S 8° 06' 20"E, along said well marked line to a Pine knot found set for corner, a distance of 363.00 feet from which a 36" Pen Oak found marked "X" brs. N 33 1/2' W. 1.5 feet and a 18" Pen Oak found marked "X" brs. S 46 E, 18.3 feet.

THENCE: S 19° 29' 42"E, along said well marked line to a Pine knot found set for corner, a distance of 190.97 feet a 14" Pen Oak marked "X" brs. S 79 1/2'W, 10.2 feet and a 6" Blackgum marked "X" brs. S 67 E, 8.7'.

THENCE: S 18° 30' 35"W, along said well marked line, 114.09 feet a 3/8" Reinf. Rod for corner from which a 12" Blackgum found marked "X" brs. N 74 1/2'E, 4.6 feet.

THENCE: S 30° 55' 58"E, along said well marked line, 226.66 feet a 3/8" Reinf. Rod for corner from which a 30" Pine marked "X" brs. N 22 1/4'W, 6.8 feet and a 12" Pine marked "X" brs. S 36 W, 26.00 feet.

THENCE: S 30° 11' 35"W, along said well marked line, 367.44 feet a 3/8" Reinf. Rod for corner from which a 15" Sweetgum found marked "X" brs. S 58 W, 10.00 feet.

THENCE: S 2° 09' 56"E, along said well marked line to a Pine knot found set for corner, a distance of 194.51 feet from which a 8" Sweetgum found marked "X" brs. S 82 E, 12.1 feet.

THENCE: S 9° 14' 18"E, along said well marked line to a Pine knot found set for corner, a distance of 230.23 feet from which a 14" Post Oak found marked "X" brs. S 46 1/2' E, 5.5 feet and a 12" Pen Oak found marked "X"

PRU_0135

brs. 45 1/2' W, 5.9 feet.

THENCE: S 55° 52' 00"E, along said well marked line, 122.59 feet.

THENCE: S 39° 57' 49"E, along said well marked line, 298.43 feet a 3/8" Reinf. Rod for corner from which a 24" Pine found marked "X" brs. N 56 E, 18.2 feet.

THENCE: S 3° 51' 54"W, along said well marked line to a Pine knot found set for corner, a distance of 382.75 feet from which a 10" Pine marked "X" brs. S 33 W, 11.5 feet.

THENCE: S 31° 52' 54"E, along said well marked line to the SE corner of said 115 1/2 acre tract, a distance of 217.09 feet a Mulberry stake found set for corner from which a 24" Blackgum found marked "X" brs. S 58 1/2' W, 12.5 feet and a 12" Beech found marked "X" brs. N 41 E, 9.5 feet.

THENCE: S 59° 12' 38"W, along the SBL of said 115 1/2 acre tract and the SBL of said J. S. Collins Survey and the NBL of M. B. Griffith Survey, A-19 to the SW corner of said 115 1/2 acre tract being the SE corner of said W. L. Brown 72 acre tract, a distance of 1472.82 feet a flanged top axle found set for corner from which a 10" Black Jack found marked "X" brs. S 20 W, 33.1 feet and a 9" Pine stump brs. N 70 W, 36.5 feet.

THENCE: N 47° 58' 00"W, along a WBL of said 115 1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1212.50 feet a iron pipe found set for corner from which a 8" Hackberry found marked "X" brs. S 81 1/2' E, 84.6 feet.

THENCE: N 11° 37'W, along a WBL of said 115 1/2 acre tract and a EBL of said W. L. Brown 72 acre tract, 1675.60 feet to the place of beginning containing 126.632 acres of land.

PRU_0136

## SCHEDULE B

Policy No.: 98272565                  File No.: SA01-135

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of the terms and conditions of the leases or easements insured, if any, shown in Schedule A and the following matters:

1. The following restrictive covenants of record itemized below (the Company must either insert specific recording data or delete this exception): THIS EXCEPTION IS HEREBY DELETED.

2. Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3. Homestead or community property or survivorship rights, if any, of any spouse of any insured.

4. Any titles or rights asserted by anyone, including but not limited to, persons, the public, corporations, governments or other entities,
> a. to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or
> b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or
> c. to filled-in lands, or artificial islands, or
> d. to statutory water rights, including riparian rights, or
> e. to the area extending from the line of mean low tide to the line of vegetation, or the right of access to that area or easement along and across that area.

5. Standby fees, taxes and assessments by any taxing authority for the year 2002 and subsequent years, and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership, but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of Improvements not assessed for a previous tax year.

6. The following matters and all terms of the documents creating or offering evidence of the matters (The Company must insert matters or delete this exception).:

> a. Rights of Parties in Possession.

> b. All visible and apparent easements, whether for street, road, utility or other purposes.

> c. Any portion of the herein described property lying within the boundary of any roadway.

> d. The Acreage Content in the legal description of the property herein insured is specifically excepted from the coverage of this Policy.

e. The Tax Certificate issued by the Taxing Authorities is issued on real property only. It does not include taxes on the mineral estate and/or personal property, therefore, no liability is assumed hereunder for the payment of said taxes on the mineral estate and/or personal property.

f. Title to any of the oil, gas and other minerals in, under and that may be produced from the insured premises. The following is provided for informational purposes only:

    (i)    Mineral Reservation as set forth in instrument from Roy Atkinson to V. R. Harlow, dated November 7, 1934, and recorded in Vol. 74, Page 542, Deed Records of San Augustine County, Texas, reserving ½ of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith;

    (ii)    Mineral Reservation as set forth in instrument from E. G. Prud'homme, et ux, to Eck G. Prudhomme, et al, dated May 22, 1971, and recorded in Vol. 166, Page 239, Deed Records of San Augustine County, Texas, reserving ½ of the minerals and/or royalty interest, the royalties, bonuses and rentals in connection therewith;

    (iii)    Mineral Reservation as set forth in multiple Warranty Deeds from Eck G. Prud'homme, et al, to Walter Bounds and wife, Carolyn B. Bounds, all dated September 7, 2001, and recorded in the Real Property Records of San Augustine County, Texas, as follows: Vol. 24, Page 20; Vol. 24, Page 25; Vol. 24, Page 28; Vol. 24, Page 31; Vol. 24, Page 34; and Vol. 24, Page 37.

Title to said interests has not been investigated subsequent to the dates of aforesaid instruments.

PRU_0138

action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

5. PROOF OF LOSS OR DAMAGE.

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 91 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of

payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

7. DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE.

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A; or,

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy at the date the insured claimant is required to furnish to Company a proof of loss or damage in accordance with Section 5 of these Conditions and Stipulations.

(b) In the event the Amount of Insurance stated in Schedule A at the Date of Policy is less than 80 percent of the value of the insured estate or interest or the full consideration paid for the land, whichever is less, or if subsequent to the Date of Policy an improvement is erected on the land which increases the value of the insured estate or interest by at least 20 percent over the Amount of Insurance stated in Schedule A, then this policy is subject to the following:

(i) where no subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that the amount of insurance at Date of Policy bears to the total value of the insured estate or interest at Date of Policy; or

(ii) where a subsequent improvement has been made, as to any partial loss, the Company shall only pay the pro rata in the proportion that 120 percent of the Amount of Insurance stated in Schedule A bears to the sum of the Amount of Insurance stated in Schedule A and the amount expended for the improvement.

The provisions of this paragraph shall not apply to costs, attorneys' fees and expenses for which the Company is liable under this policy, and shall only apply to that portion of any loss which exceeds, in the aggregate, 10 percent of the Amount of Insurance stated in Schedule A.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

8. APPORTIONMENT.

If the land described in Schedule A consists of two or more parcels that are not used as a single site, and loss is established affecting one or more of the parcels but not all, the loss shall be computed and settled on a pro rata basis as if the amount of insurance under this policy was divided pro rata as to the value on Date of Policy of each separate parcel to the whole, exclusive of any improvements made subsequent to Date of Policy, unless a liability or value has otherwise been agreed upon as to each parcel by the Company and the insured at the time of the issuance of this policy and shown by an express statement or by an endorsement attached to this policy.

9. LIMITATION OF LIABILITY.

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, all as insured, or takes action in accordance with Section 3 or Section 6, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto.

11. LIABILITY NONCUMULATIVE.

It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy to the insured owner.

12. PAYMENT OF LOSS.

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in

PRU_0139

accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

13. SUBROGATION UPON PAYMENT OR SETTLEMENT.

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies that the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to these rights and remedies in the proportion that the Company's payment bears to the whole amount of the loss.

If loss should result from any act of the insured claimant, as stated above, that act shall not void this policy, but the Company, in that event, shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(b) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

14. ARBITRATION.

Unless prohibited by applicable law or unless this arbitration section is deleted by specific provision in Schedule B of this policy, either the company or the insured may demand arbitration pursuant to the Title Arbitration Rules or the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less SHALL Be arbitrated at the request of either the Company or the Insured, unless the insured is an individual person (as distinguished from a corporation, trust, partnership, association or other legal entity). All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

15. LIABILITY LIMITED TO THIS POLICY: POLICY ENTIRE CONTRACT.

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

16. SEVERABILITY.

In the event any provision of the policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

17. NOTICE, WHERE SENT.

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at P.O. Box 1591, Baton Rouge, Louisiana 70821.

COMPLAINT NOTICE

Should any dispute arise about your premium or about a claim that you have filed, contact the agent or write to the Company that issued the policy. If the problem is not resolved, you also may write the Texas Department of Insurance, P.O. Box 149091, Austin, TX 78714-9091, Fax No. (512) 475-1771. This notice of complaint procedure is for information only and does not become a part or condition of the policy.

OWNER POLICY

Issued Through The Office Of:

San Augustine County Abstract Company
104 S. Broadway
San Augustine, TX 75972
(409)275-2304

Agent for

United General Title Insurance Company

United General
Title
Insurance Company

CORPORATE OFFICE
P.O. Box 1591
Baton Rouge, LA 70821

FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL: 1-800-999-3470

PRU_0140